IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
January 10, 2017 Session

**WADE HARVEY, EX REL. ALEXIS BREANNA GLADDEN v. CUMBERLAND TRUST AND INVESTMENT COMPANY, ET AL.**

**Appeal by Permission from the Court of Appeals
Circuit Court for Hamblen County
No. 12CV119       Thomas J. Wright, Judge**

_____

**No. E2015-00941-SC-R11-CV**

_____

In this interlocutory appeal, the trustee of a trust executed an investment/brokerage account agreement that included a provision requiring the arbitration of disputes. The trust beneficiary filed a lawsuit asserting claims against the investment broker, and the defendant broker sought to compel arbitration under the arbitration provision in the account agreement. The trial court granted the motion to compel arbitration and granted permission for this interlocutory appeal. The Court of Appeals reversed. On appeal, we are asked to determine whether the signature of the trustee on the account agreement binds the beneficiary of the trust to the predispute arbitration provision. We hold that the Tennessee Uniform Trust Code is intended to give trustees broad authority to fulfill their duties as trustee. We also hold that the Tennessee Uniform Trust Code gives trustees the power to enter into predispute arbitration agreements, so long as doing so is not prohibited under the operative trust instrument. We hold that the trust instrument in this case gives the named trustee broad authority and does not prohibit the trustee from entering into a predispute arbitration agreement. As a result, we interpret the trust instrument as authorizing the trustee to execute the account agreement with the defendant broker, including the predispute arbitration provision therein. Thus, under both the Tennessee Uniform Trust Code and the operative trust instrument, the trustee had authority to enter into the arbitration agreement contained within the account agreement. The question of whether the trust beneficiary in this case is bound by the arbitration provision is governed by the principle that a third party who seeks the benefit of a contract must also bear its burdens. Applying this principle, the trust beneficiary in this case may be bound to arbitrate claims against the investment broker that seek to enforce the account agreement. We reverse the decision of the Court of Appeals and vacate the trial court order compelling arbitration of all claims. We remand the case to the trial court for further proceedings, including a determination as to which if any of the claims asserted by the trust beneficiary seek to enforce the account agreement.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Case Remanded to the Trial Court**

HOLLY KIRBY, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

Mark D. Griffin and Will E. Routt, Memphis, Tennessee, for the appellants, Albert Alexander, Jr., and Wunderlich Securities, Inc.

William Lewis Jenkins, Jr., Dyersburg, Tennessee, and F. Braxton Terry, Morristown, Tennessee, for the appellee, Wade Harvey, Jr., ex rel. Alexis Breanna Gladden.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

*Trust Formation*

The minor trust beneficiary in this case, Alexis Breanne Gladden, was born in 1997 to Shauna Gladden (a/k/a Shauna Lynn Harvey) ("Mother") and Billy P. Gladden ("Father"). When Alexis was eight months old, she was hospitalized with fever and possible sepsis. In the hospital, there was apparently a delay in administering antibiotics to Alexis. Complications ensued. Alexis endured a lengthy hospitalization and multiple surgeries, including several amputations, and ended up significantly disabled.[1]

As a result, Mother filed a lawsuit in the Circuit Court for Hamblen County, Tennessee, against the pediatric practice, the physicians, the hospital, and the nurses. The lawsuit asserted that they were responsible for the catastrophic illness and injuries to infant Alexis. All of the defendants initially denied liability.

In May 2001, Mother settled with the physicians and the pediatric practice for a total of $1,000,000. In connection with its approval of the settlement, the circuit court required the establishment of a trust for the benefit of Alexis to receive the settlement

---

[1] Eighteen months after this incident, Mother and Father divorced. Mother was awarded custody of Alexis.

proceeds. Pursuant to this directive, a trust instrument ("Trust Instrument") was executed and approved by the circuit court, establishing the Alexis Breanne Gladden Irrevocable Trust ("Trust"). The Trust Instrument states that the Trust was created "as a means by which trust assets may be held for the benefit" of Alexis, and recites an intent "to provide a system for fiscal management, administration and disbursement, advocacy, care and emotional guidance" for Alexis.[2] As outlined below, the Trust Instrument gave the Trustee broad authority to invest the trust assets and settle and arbitrate disputes.[3]

A.G. Edwards Trust Company, FSB ("A.G. Edwards"), was designated as the Trustee. Slightly less than half of the proceeds from the settlement with the physicians and the pediatric practice were paid to A.G. Edwards as the Trustee and ultimately became the initial Trust assets. Of the remainder, $150,000 went to Mother individually, and the balance was paid toward attorney fees and expenses.

Two months later, Mother settled with the hospital and the nurses for a total of $3,350,000. Of this total, almost $2,100,000 was paid to the Trustee to pay into the Trust, $130,000 was paid to Mother individually, and the rest went toward attorney fees and expenses. Thus, the Trust received a total of almost $2,600,000 in settlement monies for the benefit of Alexis.[4]

In October 2002, Mother successfully petitioned the circuit court to remove A.G. Edwards as Trustee and appoint the Wilmington Trust Company ("Wilmington") as the successor Trustee, with Defendant/Appellant Albert M. Alexander, Jr., to serve as financial advisor to the Trust. During Wilmington's tenure as Trustee, the Trust

---

[2] The stated objective in the Trust Instrument was to permit Alexis to "live as independently as possible in a safe environment," with a preference for Alexis to "live in a private residence with personal, professional and financial assistance as needed" and avoid residing in an institutional setting.

[3] The pertinent provisions of the Trust Instrument are discussed in the Analysis section of this Opinion.

[4] The Trust Instrument named Alexis as the sole beneficiary of the Trust and recognized that she would "require continuing support, assistance and supervision for the rest of her life." Under the Trust Instrument, Alexis was not the owner of the Trust property (except for income tax purposes) and would have no access to either the principal or the income of the Trust. Instead, the Trustee was tasked with the responsibility for determining the discretionary distributions of principal and income from the Trust. Along the same lines, the trial court's order provided for the settlement proceeds to be paid into the Trust without transferring ownership of the settlement proceeds to Alexis.

retained Defendant/Appellant Wunderlich Securities, Inc. ("Wunderlich"), to supervise and direct some of the Trust assets.[5]

In 2004, again at Mother's request, the circuit court removed Wilmington as Trustee and appointed Cumberland Trust and Investment Company ("Cumberland") in its stead.[6] Pursuant to Mother's petition, the circuit court specified that Mr. Alexander would remain as the financial advisor to the Trust. After Cumberland became the Trustee, the Trust continued to invest Trust assets with Wunderlich.

*Investment Account Agreement*

In 2009, Cumberland entered into the agreement that contains the arbitration clause that is the subject of this appeal. In July 2009, Cumberland and Wunderlich executed a contract entitled "Pathways Client Agreement" ("Client Agreement"), under which Cumberland engaged Wunderlich's investment services for the Trust.[7] The Client Agreement identifies the Trust as the subject of the parties' agreement and Alexis as the beneficiary of the Trust. In addition, page one of the Client Agreement contains a notice in bold letters that it includes a predispute arbitration agreement, and provides for the parties to sign an acknowledgement that they received a copy of the arbitration agreement.[8] Following this notice are the signatures of the representatives of both

---

[5] Wunderlich's involvement with the Trust roughly coincided with the engagement of Mr. Alexander as financial advisor to the Trust, and it is undisputed that Mr. Alexander was an employee of Wunderlich. However, it is unclear in the record exactly when Mr. Alexander's employment with Wunderlich began; specifically, it is unclear whether Mr. Alexander was already employed by Wunderlich at the time Wunderlich was retained to supervise and direct Trust assets. Regardless, the parties do not dispute that Mr. Alexander was a registered representative of Wunderlich at all times material to this lawsuit.

[6] The change in trustees had no effect on the obligations of the Trustee under the Trust Instrument. As noted below, the trial court's October 12, 2004 order appointing Cumberland as successor Trustee stated that Cumberland would have "all rights, powers, and privilege[s] and be subject to all of the obligations and duties, both discretionary and ministerial" under the Trust Instrument. With approval from the trial court, Cumberland, as Trustee, "completely" restated the Trust "to carry out the original intention of the Court and the parties hereto."

[7] Wunderlich's relationship with the Trust included contracts other than the Client Agreement that also contained predispute arbitration clauses. Nevertheless, in this appeal, the Defendants appear to rely only on the predispute arbitration clause contained in the Client Agreement, so our analysis is confined to that contract.

[8] The notice on page one of the Client Agreement states: "THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE LOCATED ON PAGE 5, SECTION 21. THE UNDERSIGNED HEREBY ACKNOWLEDGES RECEIPT OF A COPY OF THIS AGREEMENT." As

Cumberland and Wunderlich, as well as the signature of Mr. Alexander as financial advisor to the Trust.

*Lawsuit Underlying This Appeal*

For reasons that are not stated expressly in the record, in June 2011, the circuit court appointed Alexis's maternal grandfather, Plaintiff/Appellee Wade Harvey, Sr., as the guardian of Alexis.[9]

Almost a year later, on May 10, 2012, Mr. Harvey, as next friend of Alexis ("Plaintiff"), filed the lawsuit underlying this appeal in the Circuit Court of Hamblen County, Tennessee. Among others, the amended complaint named as defendants Cumberland, Mr. Alexander, and Wunderlich.[10]

---

discussed further below, in relevant part, the arbitration agreement on pages five and six of the Client Agreement provides:

> This Agreement contains a predispute arbitration clause. By signing an arbitration agreement, the parties agree as follows: All of the parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which the claim is filed.
>
> . . . .
>
> It is agreed that all controversies or disputes which may arise between you and Introducing Firm, Clearing Agent and any Sub-Advisor (and/or any other agent), (collectively, "us") concerning any transaction or the construction, performance or breach of this Agreement or any other agreement between us, whether entered into prior to, on, or subsequent to the date of this Agreement, including any controversy concerning whether an issue is arbitrable, shall be determined by arbitration conducted before, and only before, an arbitration panel set up by the Financial Industry Regulatory Authority ("FINRA") in accordance with its arbitration procedures. Any of us may initiate arbitration by filing a written claim with FINRA. Any arbitration under this Agreement will be conducted pursuant to the Federal Arbitration Act and the Laws of the State of New York.

In another section, the Client Agreement states: "This Agreement is made and will be interpreted under applicable federal law, including the Federal Arbitration Act and the laws of the State of New York, regardless of choice of laws thereof."

[9] Later events outlined below indicate the possible impetus for the appointment of Mr. Harvey as guardian.

[10] In addition, the Amended Complaint named the following defendants: Joi S. Chatman (a trust officer at Cumberland), Wells Fargo & Company, Wells Fargo Advisors, LLC as successor in interest to A.G. Edwards, Inc. d/b/a A.G. Edwards & Sons, Inc., A.G. Edwards, Inc., and A.G. Edwards & Sons, Inc.

The complaint alleged that, after Mr. Harvey was appointed as Alexis's guardian in June 2011, he discovered that the Trust funds had been drastically depleted. The complaint noted that, until approximately 2008, the Trust had retained a corpus totaling at least $2,300,000. Soon, however, the Trust assets began to be "recklessly depleted." According to Plaintiff, during 2009, there were $578,000 in disbursements from the Trust. The rate of depletion accelerated during 2010. That year, there were $886,000 in disbursements, some of which went to build a large five-bedroom house on seven acres of land, an expenditure that the complaint characterized as being of "no use" to Alexis. The end result, the complaint alleged, was reduction of the Trust corpus to less than $200,000.

The complaint asserted that Wunderlich and Mr. Alexander (together "Defendants") had breached a number of duties to Alexis. These included their fiduciary duty in investing Trust monies; their duty to either disclose conflicts of interest or withdraw in the event of such conflicts; and their duty to act in Alexis's best interest and safeguard the Trust monies. Among other things, the complaint asserted that the Defendants failed to disclose facts material to their decision-making; failed to properly oversee the Trust assets and disbursements; negligently mismanaged Trust funds; gave negligent investment advice to the Trust; misappropriated Trust funds; engaged in deceptive and unfair trade practices under the Tennessee Consumer Protection Act; and fraudulently allowed Trust monies to be used on purchases that had no value to Alexis, resulting in the near complete depletion of the Trust monies.

As to Mr. Alexander, the complaint alleged that he entered into an inappropriate relationship with Mother, "which led to the unscrupulous spending" of Trust monies intended to benefit Alexis. In turn, the complaint asserted, the other defendants negligently failed to monitor Mr. Alexander, who held himself out as an investment advisor. The complaint alleged that Mr. Alexander advised Mother to change from trustee to trustee, which facilitated their manipulation of the Trust to accomplish their personal desires. As relief, the complaint sought a complete accounting of the Trust funds and an award of compensatory damages "in an amount no less than $3,925,000."

Cumberland filed an answer to Plaintiff's amended complaint.[11] Wunderlich and Mr. Alexander jointly filed a notice of appearance followed by a motion to compel arbitration and stay all court proceedings.

---

In November 2012, Plaintiff took a voluntary nonsuit without prejudice as to Wells Fargo & Company, Wells Fargo Advisors, LLC, as successor in interest to A.G. Edwards, Inc., d/b/a A.G. Edwards & Sons, Inc., A.G. Edwards, Inc., A.G. Edwards & Sons, Inc.

[11] Co-defendant and Cumberland trust officer Joi Chatman filed a joint answer with Cumberland.

In February 2013, the trial court granted the motion to compel arbitration and stay all proceedings.[12] The Plaintiff filed a motion for permission to seek an interlocutory appeal from the order compelling arbitration, pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. *See* Tenn. R. App. P. 9. In the motion, the Plaintiff argued that the Trustee had no authority to execute a predispute arbitration agreement or waive the right to a jury trial, and that the arbitration agreement was not enforceable against the beneficiary of the Trust. The Defendants opposed the Plaintiff's request for permission for interlocutory appeal.

On July 11, 2013, Alexis died. In September 2013, all parties consented to substitute Mr. Harvey as Plaintiff in the lawsuit. Mr. Alexander and Wunderlich added a proviso that their consent to substitute parties should not be construed as a waiver of their right to have the disputes arbitrated.

In December 2014, the trial court held a hearing on the Plaintiff's request for permission to seek an interlocutory appeal and on May 8, 2015, the trial court granted permission for the appeal. In its order, the trial court stated the reason it granted permission for the appeal as well as the question certified:

> [A]lthough this Court granted Defendants' motion to compel arbitration based on the facts and arguments presented by the parties and controlling precedent under Tennessee law, the Court is not aware of a Tennessee case directly on point addressing the precise issue of whether the signature of a trustee on an investment/brokerage account agreement may bind a beneficiary of a trust to conduct arbitration. The parties presented conflicting authority from out of state on this precise issue in connection with the motion to compel arbitration. If resolution of that particular issue would be dispositive of whether or not an arbitrator had authority to hear

---

[12] Also in February 2013, Plaintiff filed a motion to compel the payment of benefits to Mr. Harvey for the care of Alexis. The motion alleged that the home built with Trust monies had been sold at auction but that the Plaintiff had been provided no information about the sale or its proceeds. The motion further asserted that the handicap-accessible van purchased by the Trust for Alexis, used to transport her to numerous medical appointments, had been repossessed because the Trust did not properly title and register the vehicle. Without the van, the motion said, Mr. Harvey was forced to physically pick up Alexis and move her in and out of his car in order to transport her. Despite the substantial expenses associated with providing Alexis twenty-four-hour-a-day care in all aspects of her life, and despite an explicit request for payment from the Defendants, the motion alleged, during the preceding twenty-one months Mr. Harvey had been caring for Alexis, he received no funds or assistance from the Trust other than a single $1,500 payment to cover some expenses.

this case, then an interlocutory appeal at this point will assist in potentially reducing needless litigation.

As required under Rule 9, the Court of Appeals granted permission for the appeal as well. *See* Tenn. R. App. P. 9. The Court of Appeals stated that it granted permission for appeal on "the sole issue of whether the signature of the trustee on an investment/brokerage account agreement agreeing to arbitration binds the Minor beneficiary of the Trust to conduct arbitration of unknown future disputes and claims." *Gladden v. Cumberland Trust & Inv. Co.*, No. E2015-00941-COA-R9-CV, 2016 WL 1166341, at *4 (Tenn. Ct. App. Mar. 24, 2016).

The Court of Appeals decided the issue based on its construction of the language in the Trust Instrument. It acknowledged that the Trust Instrument gives the Trustee the right to "settle, by compromise, arbitration or otherwise any and all claims and demands." *Id.* at *5. The intermediate appellate court observed: "[W]ithout question the trustee has the right under the Trust [Instrument] to agree to arbitration binding the Minor beneficiary as to claims or demands once they have arisen." *Id.* However, it construed the word "claim" as used in these provisions as referring only to existing claims, not "disputes that have not yet arisen." *Id.* On this basis, the Court of Appeals reasoned that the phrase "any and all" in the Trust Instrument did not modify "claims and demands" to refer to disputes "not yet in existence." *Id.* It concluded that the Trust Instrument "does not provide that the trustee has the right to agree to arbitration prior to a claim or demand arising," so the Trustee's signature on the Client Agreement did not bind Plaintiff to arbitrate the disputes with Wunderlich. *Id.* at *6. Accordingly, the Court of Appeals reversed the trial court's order compelling arbitration. *Id.*

The Defendants applied to this Court for permission to appeal, which was granted.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

In this case, the trial court granted permission to appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. *See* Tenn. R. App. P. 9. As required under Rule 9, the Court of Appeals granted permission for the appeal as well. *Id.* The scope of the issues that may be considered in a Rule 9 appeal differs from the scope of the issues that may be raised in an appeal as of right under Rule 3 of the Tennessee Rules of Appellate Procedure:

> Unlike an appeal as of right under Tennessee Rule of Appellate Procedure 3, in which both the appellant and the appellee have broad latitude with regard to the issues that may be raised, "[w]hen dealing with an

interlocutory appeal, the Court can and will deal only with those matters clearly embraced within the question certified to it."

*Young v. City of LaFollette*, 479 S.W.3d 785, 789 (Tenn. 2015) (quoting *Tenn. Dep't of Mental Health & Mental Retardation v. Hughes*, 531 S.W.2d 299, 300 (Tenn. 1975)).

In their request to this Court for permission to appeal, the Defendants ask the Court to consider several issues.[13] As required under our Rules, we focus on the question certified by the trial court in its order granting permission to seek an interlocutory appeal, in the Court of Appeals order granting the appeal, and "'matters clearly embraced within the question certified'" to us. *Young*, 479 S.W.3d at 789 (quoting *Hughes*, 531 S.W.2d at 300). The trial court certified the question of "[W]hether the signature of a trustee on an investment/brokerage account agreement may bind a beneficiary of a trust to conduct arbitration." The Court of Appeals stated the question similarly: "whether the signature of the trustee on an investment/brokerage account agreement agreeing to arbitration binds the Minor beneficiary of the Trust to conduct arbitration of unknown future disputes and claims." *Gladden*, 2016 WL 1166341, at *4. We consider the issues the Defendants seek to raise only to the extent that they are embraced within the question certified below.

This appeal arises from the trial court's order granting the motion to compel arbitration. We review the enforcement of an arbitration agreement de novo, with no presumption of the correctness of the lower courts' rulings. *Rosenberg v. BlueCross BlueShield of Tenn., Inc.*, 219 S.W.3d 892, 903 (Tenn. Ct. App. 2006) (citing *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 497 (6th Cir. 2004)). "A trial court's order on a motion to compel arbitration addresses itself primarily to the application of contract law. We review such an order with no presumption of correctness on appeal." *Id.*; *see also Great Earth Cos. v. Simons*, 288 F.3d 878, 888 (6th Cir. 2002) (review of a lower court's ruling compelling arbitration is de novo).

In order to resolve the arbitration issue in this case, we must construe the Trust Instrument and applicable statutory provisions. These issues also present questions of

---

[13] In the Defendants' application for permission to appeal to this Court, they seek to raise three questions for our review: (1) whether the finding by the Court of Appeals "that a trustee cannot agree to arbitrate future or unknown disputes is in conflict with the Tennessee Uniform Trust Code and Tennessee case law and accordingly in error;" (2) whether the Court of Appeals "applied the wrong standard to the question of the powers granted to trustees under the Tennessee Uniform Trust Code by not considering whether the trust agreement at issue in this instance 'expressly provided' that the trustee could not agree to arbitrate future or unknown disputes;" and (3) whether the Court of Appeals "erred when it found that the language of the trust agreement at issue in this instance did not provide the trustee with the power to agree to arbitration of unknown future claims or disputes." Pet'rs' Appl. Perm. to Appeal 2, May 23, 2016.

law, reviewed de novo with no presumption that the lower courts' rulings are correct. *See BSG v. Check Velocity, Inc.*, 395 S.W.3d 90, 92 (Tenn. 2012) ("The interpretation of a written contract is a question of law, which we review de novo."); *Marks v. S. Trust Co.*, 310 S.W.2d 435, 437-38 (Tenn. 1958) (trust instruments should be construed and interpreted similarly to contracts and wills); *Presley v. Hanks*, 782 S.W.2d 482, 487 (Tenn. Ct. App. 1989) ("[C]onstruction of a will is a question of law for the court . . . ."). We must also construe applicable statutory provisions. *Am. Heritage Apartments, Inc. v. Hamilton Cnty. Water & Wastewater Treatment Auth.*, 494 S.W.3d 31, 40 (Tenn. 2016) ("We review the interpretation of the statutes by the lower courts de novo, with no presumption of correctness.").

## ANALYSIS

The parties to this appeal approach the issues from very different vantage points. Appellant/Defendants Wunderlich and Mr. Alexander contend that the governing Act, the Tennessee Uniform Trust Code, Tennessee Code Annotated sections 35-15-101 through 35-15-1206 (2015), grants trustees broad authority and allows a trustee to enter into predispute arbitration agreements unless the governing trust instrument *expressly* provides that the trustee *does not* have such power. Wunderlich and Mr. Alexander maintain that the Trust Instrument does not prohibit the Trustee from entering into predispute arbitration agreements, so the Trustee had authority to do so. They contend that Appellee-Plaintiff Mr. Harvey, on behalf of Alexis, is bound by the arbitration agreement executed by Wunderlich and the Trustee, so all of the claims asserted in this lawsuit must be arbitrated.

In response, Plaintiff contends that Tennessee trust law gives trustees only the powers *expressly granted* in the governing trust instrument. Plaintiff agrees with the Court of Appeals' approach and maintains that the Trust Instrument in this case only grants the Trustee authority to enter into arbitration *after* the subject claim has arisen. Plaintiff also argues that neither the Tennessee Uniform Trust Code nor the Trust Instrument permits the Trustee to waive the right to a jury trial and enter into predispute arbitration agreements. Entering into a predispute arbitration agreement and thereby waiving future rights, Plaintiff insists, amounts to a breach of the Trustee's fiduciary duty to act in utmost good faith. Finally, Plaintiff argues that the arbitration agreement between the Trust and Wunderlich is not binding on the Trust beneficiary because: (1) the Trustee was not the agent of the Trust beneficiary; (2) the Plaintiff did not sue to enforce the contract containing the arbitration agreement; and (3) Alexis was a minor.

Resolution of the issues presented in this appeal requires us to interpret the Tennessee Uniform Trust Code and the Trust Instrument. To provide necessary background and context for discerning the legislature's intent and purpose in adopting the

- 10 -

Tennessee Uniform Trust Code, we will briefly review the history of trust law, focusing on the evolution of the trustee's authority as well as the promulgation of the Uniform Trust Code, on which the Tennessee Uniform Trust Code is based. Next, we examine the pertinent provisions of the Tennessee Uniform Trust Code and the Trust Instrument to determine whether the Trustee had authority to enter into a predispute arbitration agreement and whether doing so constituted a breach of the Trustee's fiduciary duty. We then consider the circumstances under which a trust beneficiary who did not sign a predispute arbitration agreement may nevertheless be bound by it. We also consider whether the fact that the Trust beneficiary in this case was a minor renders the arbitration provision unenforceable. Finally, we remand to the trial court for a determination regarding which of the Plaintiff's claims are subject to the arbitration agreement in this case, under the parameters set forth in this Opinion.

## An Abbreviated History of Trusts

In outlining the reasons for proposing uniform trust statutes, a member of the drafting committee for the Uniform Trust Code commented that "trust law is an ancient field." John H. Langbein, *Why Did Trust Law Become Statute Law in the United States?*, 58 Ala. L. Rev. 1069, 1071 (2007).[14] Modern English and American trusts resulted from the struggle of landowners in medieval England to control the disposition of their real property. *See id.* at 1071-72; Richard T. Bowser & James B. McLaughlin, Jr., *Wiggins Wills & Administration of Estates in North Carolina*, § 1:3 Norman Conquest (4th ed. Nov. 2016 Update).

In medieval England, real property constituted the main form of wealth. Under the common law at that time, land was not devisable. Upon the death of the landowner, it could not pass by will, but had to descend according to the often unfair rules of intestacy.[15] *See* Langbein, *supra*, at 1071; *see also* Bowser & McLaughlin, *supra*, § 1:3; Avisheh Avini, *The Origins of the Modern English Trust Revisited*, 70 Tul. L. Rev. 1139, 1143-44 (1996); R. H. Helmholz, *The Early Enforcement of Uses*, 79 Colum. L. Rev. 1503, 1503 (1979).

---

[14] The author, Professor John H. Langbein, served on the Uniform Law Commission in addition to serving as a member of the drafting committee for the Uniform Trust Code. Langbein, *supra*, at 1069 n.a1.

[15] For example, under the rules of intestacy at the time, a widow was restricted to a one-third life estate. The entire remaining estate went to the eldest male heir; minors and unmarried females had further disadvantages in heirship. Langbein, *supra*, at 1071-72 (citing 4 W.S. Holdsworth, *A History of English Law* 442-48 (3d ed. 1924)).

To complicate matters further, under the English feudal system, the church continued as a rich and powerful influence in society and the monasteries continued to increase their ownership of real property. Bowser & McLaughlin, *supra*, § 1:3 (citing 2 Blackstone 375). The ever-increasing wealth and power of the church led to tension between the church and Parliament, culminating in the enactment of statutes that prohibited gifts of land to the church. *Id.*; Avini, *supra*, at 1143-44.

To circumvent these statutes and the common-law rules restricting the disposition of property upon death, the doctrine of uses—that is, trusts—arose. Under the doctrine, the use of land could be separated from its legal title, and legal title could be transferred to a person who was entrusted to hold the property for the benefit of another.[16] Bowser & McLaughlin, *supra*, § 1:3 (citing 2 Blackstone 330); Avini, *supra*, at 1143. While the transfer or devise of legal title to land remained constrained, the *use* of land was freely transferrable and devisable. Bowser & McLaughlin, *supra*, § 1:3 (citing 2 Blackstone 330); Avini, *supra*, at 1145. The "use" made it possible to convey land for the use of the religious order; this device allowed laymen to avoid the high cost of legal title and gave them some control over the land upon the owner's death.[17] Avini, *supra*, at 1144-45 (citing George G. Bogert & George T. Bogert, *Handbook of the Law of Trusts* 8-9 (5th ed. 1973)). This heritage established the "fragmentation of title at the core of the trust's conceptual structure," namely, "[l]egal title to the trust assets is transferred from the settlor to the trustee; equitable title is transferred from the settlor to the trust's

---

[16] Originally, uses and trusts were not enforceable in any court of law. Avini, *supra*, at 1145; *see also* James Barr Ames, *The Origin of Uses and Trusts*, 21 Harv. L. Rev. 261, 265 (1908) ("The common law could give no remedy, for by its principles the feoffee [or trustee] was the absolute owner of the land."). Later, the common law courts recognized the trustee's ownership of legal title to land, "while the Court of Chancery, administering equity, enforced the rights of the beneficiaries." Thomas P. Gallanis, *The New Direction of American Trust Law*, 97 Iowa L. Rev. 215, 217 (2011).

[17] As Professor Langbein explained:

Trust conveyancing deftly evaded this medieval law of succession. The owner of land, the person whom we now call the settlor, would transfer the land to a trustee or trustees, . . . subject to trust terms that functioned like a will. Thus, for example, a settlor might transfer land to trustees to hold it for himself and his spouse for their lives, and upon the death of the survivor, to transfer it in equal shares among his children. In that simple example, trust conveyancing allowed the settlor (1) to escape the feudal incidents, (2) to triple his widow's interest from the one-third life estate of dower, and (3) to defeat primogeniture by making equal provision for all his children.

Langbein, *supra*, at 1072.

beneficiaries." Gallanis, *supra,* at 217 (citing 1 Austin Wakeman Scott et al., *Scott and Ascher on Trusts* §1.1, at 5 (5th ed. 2008)).[18]

Trust law remained a branch of real property law "[l]ong into the nineteenth century." Langbein, *supra*, at 1073. When trusts consisted only of real property, trustees had few duties beyond holding title to the property and then conveying it to beneficiaries. *Id.* at 1073. Trustees were not "managers" of the property and "needed little in the way of powers" to fulfill their role. *Id.* In fact, the common law *disempowered* trustees as a protection for trust beneficiaries—trustees' restricted transactional powers limited the harm they could do to the beneficiaries. *Id.*; *see* I. Mark Cohen, *The Top Fourteen Things You Need to Know About the Uniform Trust Code*, 2 NAELA J. 259, 280 (2006).[19]

During the twentieth century, financial assets gradually displaced land as the main form of wealth held in trust. Over time, "[m]ost modern wealth [took] the form of financial assets—corporate shares, government and corporate bonds, insurance contracts, pension and annuity interests, bank accounts, interests in pooled investment vehicles such as mutual funds, and so forth." Langbein, *supra*, at 1072. "The management trust [was] developed in response to the movement away from family real estate as the predominant form of personal wealth." *Id.* Now, "[m]odern trust property typically consists of a portfolio of these complex financial assets" and the trust is "primarily a management device for assembling and administering a portfolio of financial assets." *Id.* "Such a portfolio requires skilled and active management." *Id.* at 1072-73.

In this changed environment, traditional trust law hampered trustees "not only by withholding transactional powers but also by deterring market actors from dealing with trustees." *Id* at 1073. Because trustees had no intrinsic powers, a party who sought to enter into a transaction related to the trust "had to demand and study the trust instrument in order to determine whether the trust authorized the trustee to transact with the trust asset in the way that the pending deal envisaged." *Id.* at 1074. Thus, "every transaction with a trustee became a research project," and the result was to "'effectively deter third parties from dealing with trustees.'"[20] *Id.* at 1074 (quoting Peter T. Wendel, *Examining*

---

[18] The author, Thomas P. Gallanis, served as the assistant executive director of the Joint Editorial Board for Uniform Trust and Estate Acts within the Uniform Law Commission. Gallanis, *supra*, at 215 n.a1.

[19] The author, I. Mark Cohen, J.D., (LL.M. in Taxation) served as the Virginia Reporter to the Uniform Trust Code. Cohen, *supra*, at 259 n.a1.

[20] The duties of a party dealing with a trust included the common law requirements of a bona fide purchaser and the common law duty of inquiry. These requirements

- 13 -

*the Mystery Behind the Unusually and Inexplicably Broad Provisions of Section Seven of the Uniform Trustees' Powers Act: A Call for Clarification*, 56 Mo. L. Rev. 25, 31 (1991)).

## Uniform Trust Code

To accommodate the new demands on trusts, a change in trust law became imperative. Most states "had a paucity of statutory law governing trust formation and administration," and the common law supplied much of the law governing trusts. Marshall H. Peterson, *Tennessee Uniform Trust Code: New Formulation for a Trusty Tool*, 41 Tenn. B. J. 24, 25 (2005).[21] Not surprisingly, the common law was slow to address new issues as they emerged. *See* Langbein, *supra*, at 1071 ("common law processes of incrementalism" were not suitable for today's trust law). Legislation was required to clear away older inconsistent law, "facilitate the workings of the management trust," *id.* at 1073, and "open the securities and other markets to trustees," *id.* at 1074. Throughout the twentieth century, legislation in the states trended toward maximizing trustees' transactional power and facilitating management trusts, *id.* at 1073-77, 1082; in large part, "[e]mpowerment replaced disempowerment," *id.* at 1073; *see also* Cohen, *supra*, at 280.

Many years before uniform trust statutes were proposed, the National Conference of Commissioners on Uniform State Laws ("NCCUSL")[22] began participating in states'

---

worked well in the relatively slow-paced, land-oriented economy of medieval England. As society progressed and commerce grew increasingly investment oriented, however, the bona fide purchaser and duty of inquiry requirements grew increasingly burdensome. This was particularly true with respect to transactions involving commercial paper, negotiable instruments, and investment securities, and even more so with respect to such transactions when a fiduciary was involved.

Peter T. Wendel, *Examining the Mystery Behind the Unusually and Inexplicably Broad Provisions of Section Seven of the Uniform Trustees' Powers Act: A Call for Clarification*, 56 Mo. L. Rev. 25, 30-31 (1991).

[21] The author, Marshall H. Peterson, served on the Tennessee Bar Association Committee to review the Uniform Trust Code and suggested revisions for its implementation in Tennessee. Peterson, *supra*, at 24 n.a1.

[22] The NCCUSL was founded in 1892. It "functions as a consortium of state governments that operate a pooled drafting service for the states," emphasizing projects "in fields in which multistate transactions, interests, or contacts make uniformity of state law advantageous." Langbein, *supra*, at 1079-80. Commissioners from all the states participate. They are appointed by state governors or the state's legislature, are members of the state bar, and are a mix of attorneys, judges, state legislators, and

attempts to codify American trust law. Langbein, *supra*, at 1080-82; Amy Morris Hess, George Gleason Bogert, & George Taylor Bogert, *Bogert Hess Trusts and Trustees* § 7 (3d ed. 2007). In 2000, after seven years of effort, the NCCUSL promulgated the first national codification of American trust law, the Uniform Trust Code. Hess, Bogert & Bogert, *supra*, § 7; Peterson, *supra*, at 25. The Uniform Trust Code was an effort to promote consistency in trust law among state jurisdictions. Peterson, *supra*, at 25. It took the trend of maximizing trustees' power "to the limit and grant[ed] trustees virtually unlimited power," kept in check primarily by the fiduciary duties incumbent upon trustees:

> Specifically, [the Uniform Trust Code] grants the trustee: (1) all powers over trust property which an unmarried competent owner has over individually owned property—unrestrained by considerations of marriage, disability, or cotenancy; (2) any other powers appropriate to achieve the proper investment, management, and distribution of the trust property; and ([3]) any other powers conferred by the [Uniform Trust Code].

Cohen, *supra*, at 280.

The Uniform Trust Code "reflects a comprehensive attempt to collect, codify, and make uniform the law of trusts." *Id.* at 263. However, because some aspects of trust law are not amenable to codification, the drafters of the Uniform Trust Code intended for "the common law of trusts and principles of equity . . . to supplement the [Uniform Trust Code], and aid in its construction." *Id.*; *see also* David M. English, *The Uniform Trust Code (2000): Significant Provisions and Policy Issues*, 67 Mo. L. Rev. 143, 148 (2002)[23] ("The [Uniform Trust Code] is supplemented by the common law of trusts, including principles of equity.").

As with much of the common law of trusts, the Uniform Trust Code "consists of rules subject to override by the terms of the trust." English, *supra*, at 155; *see also* Cohen, *supra*, at 264 ("Most of the [Uniform Trust Code] consists of default rules that apply only where the trust instrument is silent.").

---

academics. *Id.* at 1080. A reporter, usually an academic specialist in the relevant field of law, prepares and revises drafts of uniform laws. *Id.*

[23] The author, David M. English, served as a reporter to the Uniform Trust Code (2000) and as the Executive Director of the Joint Editorial Board for Uniform Trust and Estate Acts. English, *supra*, at 143 n.a1.

Thirty-two states, including Tennessee, have adopted the Uniform Trust Code.[24] "In Tennessee, a study committee representing the Tennessee Bar Association and Tennessee Banker's Association studied the [Uniform Trust Code], made recommendations for the Tennessee version, and submitted the proposal to the sponsors of the [Uniform Trust Code] legislation in the General Assembly." Peterson, *supra*, at 25. In 2004, the General Assembly enacted the Tennessee Uniform Trust Code.[25] *Id.* The Tennessee Uniform Trust Code largely follows the Uniform Trust Code but is in some respects tailored to Tennessee practice.[26] *Id.*

## Tennessee Uniform Trust Code

Consistent with the evolution in trust law to facilitate trustees' management of financial assets rather than land assets, and also consistent with the reasons for the codification of trust law and the promulgation of the Uniform Trust Code, the Tennessee

---

[24] *See* Ala. Code §§ 19-3B-101 to 19-3B-1305 (2007); Ariz. Rev. Stat. Ann. §§ 14-10101 to 14-11102 (2012); Ark. Code Ann. §§ 28-73-101 to 28-73-1106 (effective 2005); D.C. Code §§ 19-1301.01 to 19-1311.03 (2012); Fla. Stat. §§ 736.0101 to 736.1303 (2017); Kan. Stat. Ann. §§ 58a-101 to 58a-1107 (2012); Ky. Rev. Stat. Ann. §§ 386B.1-010 to 386B.11-050 (2014); Me. Rev. Stat. tit. 18-B, §§ 101 to 1104 (2012); Md. Code Ann., Est. & Trusts §§ 14.5-101 to 14.5-1006 (2015); Mass. Gen. Laws ch. 203E, §§ 101 to 1013 (2012); Mich. Comp. Laws §§ 700.7101 to 700.7913 (2013); Minn. Stat. §§ 501C.0101 to 501C.1304 (2016); Miss. Code Ann. §§ 91-8-101 to 91-8-1206 (2014); Mo. Rev. Stat. §§ 456.1-101 to 456.11-1106 (2014); Mont. Code Ann. §§ 72-38-101 to 72-38-1102 (2013); Neb. Rev. Stat. §§ 30-3801 to 30-38,110 (2008); N.H. Rev. Stat. Ann. §§ 564-B:1-101 to 564-B:12-1206 (2006); N.J. Stat. Ann. §§ 3B:31-1 to 3B:31-84 (2016); N.M. Stat. Ann. §§ 46A-1-101 to 46A-11-1105 (2003); N.C. Gen. Stat. §§ 36C-1-101 to 36C-11-1106 (2011); N.D. Cent. Code §§ 59-09-01 to 59-19-02 (2010); Ohio Rev. Code Ann. §§ 5801.01 to 5811.03 (2007); Or. Rev. Stat. §§ 130.001 to 130.910 (2011); 20 Pa. Cons. Stat. §§ 7701 to 7799.3 (2006); S.C. Code Ann. §§ 62-7-101 to 62-7-1106 (2009); Tenn. Code Ann. §§ 35-15-101 to 35-15-1103 (2016); Utah Code Ann. §§ 75-7-101 to 75-7-1201 (2013); Vt. Stat. Ann. tit. 14A, §§ 101 to 1204 (2010); Va. Code Ann. §§ 64.2-700 to 64.2-808 (2012); W. Va. Code §§ 44D-1-101 to 44D-11-1105 (2013); Wis. Stat. §§ 701.0101 to 701.1013 (2014); Wyo. Stat. Ann. §§ 4-10-101 to 4-10-1103 (2013).

[25] In 2004, after Tennessee enacted the Tennessee Uniform Trust Code, the Trust in this case was re-stated in connection with the appointment of a new trustee. Consequently, there is no question as to the applicability of the Tennessee Uniform Trust Code in this case.

[26] The Tennessee Uniform Trust Code provisions pertinent to this appeal do not differ substantively from the nationally promulgated Uniform Trust Code. The bill submitted to the Tennessee General Assembly did not differ in any substantive way from the Uniform Trust Code, except with regard to certain notice provisions and spendthrift trust provisions, neither of which are at issue in this case. Other changes included non-substantive word choices made to conform to preexisting language used in Tennessee law. Hearing on S.B. 560 before the Senate Judiciary Committee, 103d Tenn. Gen. Assemb. (Mar. 23, 2004) (statement of Bryan Howard, who chaired the Tennessee committee that studied the Uniform Trust Code for adoption in Tennessee).

Uniform Trust Code confers broad powers on trustees. Section 35-15-815(a) of the Tennessee Uniform Trust Code provides that a trustee, without authorization by a court, may exercise:

(1) Powers conferred by the terms of the trust; and

(2) Except as limited by the terms of the trust:
    (A) All powers over the trust property which an unmarried competent owner has over individually owned property;

    (B) Any other powers appropriate to achieve the proper investment, management, and distribution of the trust property; and

    (C) Any other powers conferred by this chapter.

Tenn. Code Ann. § 35-15-815(a) (2015). The Comments to the Official Text emphasize: "This section is intended to grant trustees the broadest possible powers," to be exercised in accordance with a trustee's duties "and any limitations or expansion of such powers or duties as stated in the terms of the trust." *Id.* at § 35-15-815, 2013 Restated Comments. "This broad authority is denoted by granting the trustee the powers of an unmarried competent owner of individually owned property, unlimited by restrictions that might be placed on it by marriage, disability, or cotenancy." *Id.*

The Tennessee Uniform Trust Code includes a non-exhaustive list of specific powers given to trustees, contained in section 35-15-816. Under this provision, a trustee may:

(4) Deposit trust money in an account in a regulated financial-service institution;
. . . .
(7) With respect to stocks or other securities, exercise the rights of an absolute owner, including the right to:

    (D) Deposit the securities with a depository or other regulated financial service institution;
. . . .
(14) Pay or contest any claim, settle a claim by or against the trust, and release, in whole or in part, a claim belonging to the trust;
. . . .

- 17 -

(23)  Resolve a dispute concerning the interpretation of the trust or its administration by mediation, arbitration, or other procedure for alternative dispute resolution;

. . . .

(25)  Sign and deliver contracts and other instruments that are useful to achieve or facilitate the exercise of the trustee's powers[.]

Tenn. Code Ann. § 35-15-816(b) (2015). The Comments to the Official Text note, however, that these powers are subsumed under the general authority granted in section 35-15-815, so the statutory list of specific powers adds "little of substance not already granted by T.C.A. § 35-15-815." *Id.* at § 35-15-816, 2013 Restated Comments.

The Tennessee Uniform Trust Code does not specifically address a trustee's authority to enter into a predispute arbitration agreement.  It does, however, permit and indeed encourage parties to submit claims to arbitration.  For example, as to disputes between a trustee and a beneficiary, section 35-15-111(a) provides that "the trustee and the qualified beneficiaries may enter into a binding nonjudicial settlement agreement with respect to any matter involving a trust."  Tenn. Code Ann. § 35-15-111(a) (2015).

Comments to the Trust Code shed light on the drafters' favorable view of arbitration:  "While the Tennessee Uniform Trust Code recognizes that a court may intervene in the administration of a trust to the extent its jurisdiction is invoked by interested persons, or otherwise provided by law, resolution of disputes by nonjudicial means is encouraged."  Tenn. Code Ann. § 35-15-111, 2013 Restated Comments. Additionally, the comments to section 35-15-816 observe that subsection (b)(23) of that section "authorizes a trustee to resolve disputes through mediation or arbitration," and add: "The drafters of this Tennessee Uniform Trust Code encourage the use of such alternate methods for resolving disputes."  Tenn. Code Ann. § 35-15-816, 2013 Restated Comments.

We agree with the Court of Appeals' observation that the Tennessee Uniform Trust Code does not specifically speak to *predispute* arbitration agreements. Nevertheless, considering the long history that predates the Uniform Trust Code, the reasons for the promulgation of the Uniform Trust Code, the breadth of the powers specifically accorded to trustees under the Tennessee Uniform Trust Code provisions, the admonition in the Comments that the Tennessee Uniform Trust Code was intended to accord trustees "the broadest possible powers," and the Comments indicating the drafters' approval of arbitration as a means to decide disputes, we conclude that the legislature intended for the Tennessee Uniform Trust Code to give trustees the power to enter into predispute arbitration agreements. *See* Tenn. Code Ann. § 35-15-815; Tenn. Code Ann. § 35-15-815, 2013 Restated Comments.

As noted above, the Comments to the Tennessee Uniform Trust Code caution that the broad powers given by statute to trustees may be either expanded or limited by the provisions of the governing trust instrument. *See* Tenn. Code Ann. § 35-15-815, 2013 Restated Comments ("This section is intended to grant trustees the broadest possible powers, but to be exercised always in accordance with the duties of the trustee and any limitations or expansion of such powers or duties as stated in the terms of the trust."). Therefore, we look next to the Trust Instrument in this case.

*Trust Instrument*

The Tennessee Uniform Trust Code provides guidance on the interplay between its provisions and trust instruments: "Except as otherwise provided in the terms of the trust, this chapter governs the duties and powers of a trustee . . . ." Tenn. Code Ann. § 35-15-105(a) (2015). "The terms of a trust may expand, restrict, eliminate, or otherwise vary the duties and powers of a trustee . . . provided, however, that nothing contained in this subsection (a) shall be construed to override or nullify the provisions of subsection (b)." *Id.*[27] Significantly, the Comments to the Tennessee Uniform Trust Code also observe that "most of the Uniform Trust Code consists of default rules that apply only if the terms of the trust fail to address or insufficiently cover a particular issue." Tenn. Code Ann. § 35-15-101, 2013 Restated Comments.

In this case, Article Eleven of the Trust Instrument outlines the Trustee's powers.[28] It states:

> The Trustee may exercise, without prior approval from any court, all powers conferred by this trust agreement and any other powers conferred by law, including, without limitation, those powers set forth under the common law or any fiduciary powers act or other laws of the State of Tennessee, except as otherwise specifically provided in this agreement. Each power conferred upon the Trustee by state or federal statutes shall be subject to any express limitations or contrary directions contained in this agreement.

Trust Instrument, Section 11.01, Introduction to Trustee's Powers.[29]

---

[27] Subsection 35-15-105(b) of the Tennessee Uniform Trust Code contains a limited number of "mandatory rules" that the trust instrument may *not* override. Tenn. Code Ann. § 35-15-101, 2013 Restated Comments. None of the "mandatory rules" are applicable to the issues in this appeal.

[28] The Trust Instrument expressly makes all of the Trustee's powers subject to the so-called "prudent man rule."

The Trust Instrument emphasizes the breadth of the Trustee's authority to manage the Trust's finances and investments. According to the Trust Instrument, the Trustee:

- may execute and deliver any and all instruments in writing which it considers necessary to carry out any of the powers granted in the Trust Instrument;

- shall exercise the administrative and investment powers without the order of any court, as the Trustee determines in its sole and absolute discretion to be in the best interests of the beneficiaries;

- may invest in any type of investment that it determines is consistent with the investment goals and overall goals of the Trust;

- "may buy, sell, and deal in stocks, bonds, commodities, options and other securities of any kind and in any amount";

- may permit Trust property to be held in the custody of a banking institution or brokerage firm;

- may place all or any part of the securities held by the Trust in the custody of a bank or trust company;

- may employ a broker-dealer as a custodian for securities held by the Trust; may appoint and employ investment advisors and expert advisers, among other professionals, to advise or assist it in the performance of its duties; and

- may enter into contracts, and deliver deeds or other instruments as it deems appropriate to the purposes of the Trust.

A section of the Trust Instrument entitled "Settlement Powers" contains a subsection of particular importance:

---

[29] Tennessee statutes provide that the "construction and administration of a trust are determined by the law of the jurisdiction designated in the terms of the trust instrument, which is called a state jurisdiction provision." Tenn. Code Ann. § 35-15-107(a) (2015). In this case, the state jurisdiction provision of the Trust Instrument, found in Section 12.06 (c), generally provides that it is to be construed in accordance with Tennessee law, with a few exceptions not applicable in this appeal.

The Trustee may settle, by compromise, arbitration or otherwise any and all claims and demands in favor of or against, or in any way relating to, any trust created under this agreement upon such terms as the Trustee may determine. The Trustee may release or abandon any claims in favor of this trust.

Trust Instrument, subsection 11.05(e). The language in this subsection speaks specifically to the Trustee's authority to enter into arbitration in order to settle claims related to the Trust.

Plaintiff argues that the plain language of subsection 11.05(e) gives the Trustee power to enter into arbitration *only* after a claim has arisen. According to Plaintiff, confining the Trustee's power to agree to arbitration only after claims have arisen allows the Trustee to fulfill its duty to always act in the best interest of the Trust beneficiary, because the Trustee cannot assess in advance of a dispute whether the beneficiary's best interests are served by arbitrating it. This reasoning was adopted by the Court of Appeals; it first determined that the term "claim" as used in the Trust Instrument does not include disputes that have not yet arisen, and on that premise went on to hold that the "any and all" language in the Trust Instrument does not indicate that the phrase "claims and demands" is intended to include disputes "not yet in existence." *Gladden*, 2016 WL 1166341, at *5. Finding that the "language of the Trust Agreement did not give the trustee the power to agree to arbitration of unknown future claims or disputes," the Court of Appeals held that the signature of the Trustee on the Client Agreement "does not bind the Minor beneficiary of the Trust to conduct arbitration of unknown future disputes or claims." *Id.* at *6. We must respectfully disagree.

Trust instruments are to be construed in much the same way we interpret contracts or wills. *Marks*, 310 S.W.2d at 437-38. "[T]he important thing in the construction of the trust instrument is to determine the intention of the settlor as evidenced by all the provisions of the instrument, giving no portion any greater emphasis than any other." *Id.*; *see also* Tenn. Code Ann. § 35-15-112 (2015) ("The rules of construction that apply in this state to the interpretation of and disposition of property by will also apply as appropriate to the interpretation of the terms of a trust and the disposition of the trust property."); Tenn. Code Ann. § 35-15-101, 2013 Restated Comments ("It is a primary objective of the Tennessee trust statutes that a settlor's intent be the lodestar by which a trust is interpreted . . . ."). "In determining this intention we cannot follow any hard and fast rule but each case must be considered on its own bottom." *Marks*, 310 S.W.2d at 438. "The peculiar facts and circumstances and so forth, are considered to determine what is this intention. It is not necessarily so much the language that is used by the settlor as it is his or her evident intention which governs." *Id.*

- 21 -

To ascertain the meaning of "claim" as used in the Trust Instrument, the Court of Appeals first looked at a definition in Black's Law Dictionary: "(1) The aggregate of operative facts giving rise to a right enforceable by a court . . . . (2) The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional . . . . (3) A demand for money or property to which one asserts a right." *Gladden*, 2016 WL 1166341, at *5 (quoting *Black's Law Dictionary* 240 (7th ed. 1999)). While the Court of Appeals' reasoning may find some support in the inclusion of the word "existing" in the second of the three alternative definitions, we see no discernible temporal element in the first and third definitions. Other dictionary definitions are likewise not limited to existing claims. For example, the Oxford English Dictionary's definitions of the noun "claim" include: "[a] demand or request for something considered one's due" and "[a] right or title to something." *Oxford English Dictionary Online*, https://en.oxforddictionaries.com/definition/claim (last visited August 9, 2017).[30] Moreover, the Court of Appeals' unduly restrictive interpretation of the word "claim" is at odds with other language in the Trust Instrument. Specifically, the Trust Instrument's addition of the phrase "any and all" indicates intent to give "claim" a broad, inclusive meaning and evidences no intent to limit its meaning, temporally or otherwise. *See, e.g., PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (characterizing the phrase "any and all controversies" in an arbitration agreement as "inclusive, categorical, unconditional and unlimited," and finding it "elastic enough" to encompass disputes over whether a claim is timely or within the scope of arbitration). Thus, we must respectfully disagree with the Court of Appeals' interpretation of the word "claims" to exclude claims that may arise in the future.

In addition, we are persuaded that the provisions in the Trust Instrument on the trustee's powers evidence an overall intent to give the Trustee wide-ranging authority to do anything not prohibited by the Tennessee Uniform Trust Code. The settlor clearly intended to enable the Trustee to enter into contracts and engage the services of banks and brokerage firms for purposes of investing the Trust property. We are mindful that, in modern times, engaging the services of banking and brokerage institutions almost necessarily requires a trustee to enter into predispute arbitration agreements. *See* Mary F. Radford, *Predispute Arbitration Agreements between Trustees and Financial Services Institutions: Are Beneficiaries Bound?*, 40 ACTEC L. J. 273, 342-43 (2014) ("It is not practical to prohibit trustees from signing [predispute arbitration agreements] because they currently appear in virtually every account agreement contract. . . . [T]rustees will be

---

[30] The Webster's Third New International Dictionary definitions of "claim" include "a demand of a right or a supposed right." *Merriam Webster's Third International Dictionary of the English Language Unabridged* 414 (1993).

hard-pressed to find any [financial services] institution that does not include a predispute arbitration clause in their standard contracts.").[31]

Moreover, the Plaintiff has pointed to no language in the Trust Instrument, in Subsection 11.05(e) or otherwise, that *expressly prohibits or limits* the Trustee from agreeing to settle future claims by arbitration. Nor have we found any such language.

We have already concluded that the Tennessee Uniform Trust Code does not prohibit the Trustee from entering into a predispute arbitration agreement, so long as the Trust Instrument does not do so. We now conclude that the terms of this Trust Instrument permit rather than forbid such authority. Under the Tennessee Uniform Trust Code and the Trust Instrument, the Trustee had the authority to enter into the predispute arbitration agreement with Wunderlich.

*Trustee's Fiduciary Duty*

Plaintiff argues as well that the Trustee's signature on the predispute arbitration agreement constituted a breach of its fiduciary duty to exercise good faith, because entering into such an agreement waives the beneficiary's right to a trial by jury without consideration of the particular facts involved in the claim to be arbitrated. In effect, Plaintiff invites us to hold that a trustee's decision to enter into a predispute arbitration agreement on behalf of the trust constitutes a breach of the trustee's fiduciary duty as a matter of law, without regard to the surrounding circumstances. We decline to do so.

Classifying the execution of a predispute arbitration agreement "as a breach of fiduciary duty would contradict the investment standard set forth in the [Uniform Prudent Investor Act ("UPIA")]," Radford, *supra*, at 343, codified in Tennessee's Code at §§ 35-14-101 to 114. The UPIA states that "[a] trustee shall invest and manage trust assets as a prudent investor would." *Id*. As noted above, account agreements that contain predispute arbitration provisions are ubiquitous among financial services institutions. Consequently, "most 'prudent investors' are also subject to them," and even if beneficiaries were to object, "the chances are remote that the trustee [would] be able to find another quality financial services institution that does not include the same provision in its account agreement." Radford, *supra*, at 343. "Discouraging a trustee from signing such an agreement would have the undesirable result of encouraging the trustee to proceed on his or her own, without the benefit of a brokerage firm or an investment adviser. . . . The 'prudent' individuals employ financial services institutions to assist them." *Id.*

---

[31] The author of this article served as President of the American College of Trust & Estate Counsel (ACTEC), 2011-12. Radford, *supra*, at 273 n.a1.

The strong federal policy of placing arbitration agreements on equal footing with other contracts also undermines Plaintiff's assertion that entering into a predispute arbitration agreement constitutes a breach of the Trustee's fiduciary duty. The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16 (LexisNexis 2008), provides that a written provision in "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (LexisNexis 2008). This is "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The policy of placing arbitration agreements on the same level as other contracts applies in state as well as federal courts.[32] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985). The FAA was intended to reverse "'centuries of judicial hostility to arbitration agreements,' by 'plac[ing] arbitration agreements upon the same footing as other contracts.'" *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 225-26 (1987) (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510-11 (1974)).

United State Supreme Court cases likewise reject the prior judicial antagonism towards arbitration as a forum for deciding disputes. In *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 238 (1987), and *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 483 (1989), the United States Supreme Court "effectively held that predispute agreements requiring investors to arbitrate disputes under the Securities Acts were enforceable. Since that time, it has become a widespread if not uniform practice for broker-dealers[33] and investment advisors to include predispute arbitration provisions in their account agreements." Radford, *supra*, at 281 (footnotes omitted); *see also* Constantine N. Katsoris, *The Securities Arbitrators' Nightmare*, 14 Fordham Urb. L. J. 3, 4 (1986) ("Securities investors are often required, as a condition to opening an account with a broker-dealer, to sign an agreement to arbitrate future disputes.").

---

[32] Tennessee has a state statute similar to 9 U.S.C. § 2. Tennessee Code Annotated § 29-5-302 states that "a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist at law or in equity for the revocation of any contract." Tenn. Code Ann. § 29-5-302 (2012). Moreover, this Court has acknowledged that both the FAA and the Tennessee Uniform Arbitration Act "were adopted (1) 'to promote private settlement of disputes,' and (2) to ensure the enforceability of private agreements to arbitrate. Accordingly, arbitration agreements in private contracts are now favored in Tennessee both by statute and existing case law." *Smythe*, 401 S.W.3d at 603 (citations omitted).

[33] A "broker-dealer" is a person or company in the business of buying and selling securities for customers or for its own account, or both. Radford, *supra*, at 278.

In *Rodriguez de Quijas*, the Court overruled its prior decision in *Wilko v. Swan*, 346 U.S. 427 (1953), which had held void an agreement to arbitrate future controversies under the Securities Act of 1933. *Rodriguez de Quijas*, 490 U.S. at 485. The *Rodriguez de Quijas* Court described *Wilko* as exhibiting the "old judicial hostility to arbitration," a view that that "has been steadily eroded over the years." *Id.* at 480. The Court indicated that arbitration was not necessarily a less desirable forum for deciding disputes: "'There is nothing in the record before us, nor in the facts of which we can take judicial notice, to indicate that the arbitral system . . . would not afford the plaintiff the rights to which he is entitled.'" *Id.* at 483 (quoting *Wilko*, 346 U.S. at 439 (Frankfurter, J., dissenting)); *see also McMahon,* 482 U.S. at 232 (rejecting the *Wilko* Court's aversion to arbitration).

Similarly, this Court has said, "Arbitration agreements do not limit liability, but instead designate a forum that is alternative to and independent of the judicial forum. Inside the judicial system, this Court has promulgated a Rule providing for court-administered alternative dispute resolution, including arbitration." *Buraczynski v. Eyring*, 919 S.W.2d 314, 319 (Tenn. 1996) (finding arbitration agreements between physicians and patients are not per se void as against public policy).

Under all of these circumstances, we decline to hold that the Trustee's signature on a predispute arbitration agreement constitutes a *per se* violation of the Trustee's fiduciary duty to act in good faith and in the interest of the beneficiary.[34]

### *Third-Party Beneficiary*

Having determined that the Trustee had the authority to enter into predispute arbitration agreements on behalf of the Trust, the issue becomes whether Plaintiff is subject to the arbitration agreement executed by the Trustee in this case. The signatories to the Client Agreement are Cumberland Trust as Trustee, Mr. Alexander as financial advisor, and Wunderlich by firm principal Michelle Hoffman; the minor Trust beneficiary, of course, did not sign the Client Agreement. We must determine, then, whether Plaintiff may nevertheless be bound by it.[35] *See Howsam v. Dean Witter*

---

[34] In this appeal, Plaintiff does not allege that there are particular facts in *this* case that would make the Trustee's decision to enter into a predispute arbitration agreement a breach of the Trustee's fiduciary duty, and our holding does not preclude such an argument.

[35] The FAA applies to the predispute arbitration agreement in this case. "The FAA applies to all state and federal cases in which the contract at issue requiring arbitration involves or affects interstate commerce." *Morgan Keegan & Co., Inc. v. Smythe*, No. W2010-01339-COA-R3-CV, 2011 WL 5517036, at *5 (Tenn. Ct. App. Nov. 14, 2011) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10-11 (1984)) *rev'd on other grounds*, 401 S.W.3d 595 (Tenn. 2013). Securities transactions clearly involve

*Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide.").

The Defendants contend that Plaintiff must arbitrate all of the claims asserted in the amended complaint because Alexis is an express beneficiary of the Trust Instrument and is a third-party beneficiary of the Client Agreement that contains the arbitration agreement. Citing principles of estoppel as well as the law governing third-party beneficiaries, the Defendants contend that "Plaintiff is seeking to recover for alleged breaches of duties that arise directly from the [Client Agreement] containing the arbitration provision and thus cannot simultaneously assert claims against the Defendants stemming from the agreement and seek to disavow the arbitration provision included in the agreement." A holding that Plaintiff is bound by the arbitration agreement, the Defendants claim, would be consistent with state and federal "pro-arbitration policies."

In response, Plaintiff first notes that a trustee is not an agent of the trust beneficiary; in other words, "a trust relationship is not a principal-agent relationship." A trustee is instead a fiduciary for the beneficiary. Therefore, Plaintiff contends, the Trustee in this case had no power to bind the minor beneficiary, Alexis. Plaintiff argues that principles of estoppel do not apply. Plaintiff points out that the claims in the amended complaint do not "involve the prudent investor rule" but instead involve "claims for negligence, and breach of fiduciary duty by permitting waste and defalcation with trust assets." Plaintiff asserts: "The claims in this case arise from wrongs committed, not from a contract, thus the Plaintiff here [is not] attempting to enforce the contract."[36]

It is well established that "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-49 (1986). "'The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the . . . agreement does in fact create such a duty.'" *Id.* at 649 (quoting *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546-47 (1964)). We look to ordinary contract principles to determine who is bound by a written arbitration agreement, "and of course parties can become contractually bound absent their

---

interstate commerce and "arbitration agreements connected with such transactions are subject to enforcement under the FAA." *Id.* at *6.

[36] Though not precisely stated as such, Plaintiff appears to contend that the claims asserted against the Defendants are not necessarily asserted as a third-party beneficiary of the Client Agreement. As noted below, to the extent that we discuss theories regarding third-party beneficiaries, we assume for purposes of this appeal that the Trust beneficiary may be deemed a third-party beneficiary of the Client Agreement but make no holding on that issue.

signatures." *Fisser v. Int'l Bank*, 282 F.2d 231, 233 (2d Cir. 1960). The "way[] in which a party may become bound by a written arbitration provision is limited only by generally operative principles of contract law." *Id.*; *see also Smith v. Multi-Fin. Sec. Corp.,* 171 P.3d 1267, 1272 (Colo. App. 2007) ("Generally, when the requirement to arbitrate is created by an agreement, it can be invoked only by a signatory of the agreement, and only against another signatory. Nonetheless, based on common law contract principles, nonsignatories may be bound by agreements to arbitrate." (citation omitted)).

As referenced above, the Defendants cite federal and state "pro-arbitration policies" in support of their position that Plaintiff's claims in this case must be submitted to arbitration. Indeed, a number of cases, both state and federal, characterize the FAA and similar state statutes as "favoring" arbitration. *See, e.g., Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24 (describing the FAA as embodying "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary"); *Morgan Keegan & Co., Inc. v. Smythe*, 401 S.W.3d 595, 603 (Tenn. 2013) (describing arbitration agreements in private contracts as "now favored in Tennessee both by statute and existing caselaw"). Certainly the FAA and corresponding Tennessee statutes facilitate arbitration, as a form of alternative dispute resolution, by making it clear that agreements to arbitrate disputes should be treated in the same manner as other contracts. However, the FAA policy "favoring" arbitration "is merely an acknowledgment of the FAA's commitment to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302-03 (2010) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989)). The FAA and similar state statutes are intended to erase the traditional judicial antagonism for arbitration, not force parties into arbitration who are not otherwise subject to an arbitration agreement under ordinary contract principles. The policies cited by the Defendants do not obviate the need for a judicial determination on whether the arbitration agreement in question applies to the subject dispute. *See id.* at 302-03.

We agree with Plaintiff that, in signing the Client Agreement, the Trustee did not act as the agent for the Trust beneficiary. An agency relationship is distinct from a trust relationship. Restatement (Second) of Trusts § 8 Trust and Agency (1959). "A trustee is not an agent of the trust estate or of the beneficiary, but acts for [itself] in the administration of the trust estate, although under restraint of the terms of the trust and of the law of trusts." 76 Am. Jur. 2d *Trusts* § 10 (2005) (footnotes omitted). Many years ago, the United States Supreme Court clarified the distinction between a trustee and an agent:

- 27 -

A trustee is not an agent. An agent represents and acts for his principal, who may be either a natural or artificial person. A trustee may be defined generally as a person in whom some estate interest or power in or affecting property is vested for the benefit of another. When an agent contracts in the name of his principal, the principal contracts, and is bound, but the agent is not. When a trustee contracts as such, unless he is bound, no one is bound, for he has no principal. The trust estate cannot promise; the contract is therefore the personal undertaking of the trustee. As a trustee holds the estate, although only with the power and for the purpose of managing it, he is personally bound by the contracts he makes as trustee, even when designat[ing] himself as such.

*Taylor v. Mayo,* 110 U.S. 330, 334-35 (1884). In a trust relationship, then, "the trustee acts in [its] own name." 76 Am. Jur. 2d *Trusts* § 10. For this reason, "[a]s a general rule, contracts and obligations entered into by a trustee do not impose an obligation on the beneficiaries of the trust." 90A C.J.S. *Trusts* § 381 (2002).[37] Thus, the Trustee's signature on the Client Agreement did not, in and of itself, obligate the Trust beneficiary to the arbitration provision.

We must now ascertain whether the Trust beneficiary is otherwise bound to arbitrate her claims against the Defendants. This Court has held that, in some circumstances, a third-party beneficiary to a contract may be bound by an arbitration agreement he did not sign. In *Benton v. Vanderbilt University*, plaintiff Benton, an insured with Blue Cross Blue Shield, received medical treatment at Vanderbilt University Medical Center after a car accident, and Vanderbilt was paid a discounted rate by Blue Cross Blue Shield for treating Benton. 137 S.W.3d 614, 616 (Tenn. 2004). In an agreement between Vanderbilt and Blue Cross Blue Shield, Vanderbilt agreed not to

---

[37] Tennessee has enacted the Tennessee Uniform Trust Code Representation Statutes, Tennessee Code Annotated sections 35-15-301 to 305; however, they neither apply nor affect our analysis in this case. The Tennessee Uniform Trust Code Representation Statutes provide that, to the extent there is no material conflict of interest with respect to a particular dispute, a trustee may represent and bind the beneficiaries of the trust. *Id*. They add: "Such representation principles of this part apply in numerous circumstances, including . . . for purposes of settlement of disputes, whether by a court or nonjudicially . . . ." *Id*. However, "[r]epresentation refers to those who are authorized to receive notices on behalf of, and otherwise represent and bind persons whose interests must be represented in a particular matter." Peterson, *supra*, at 27 (as noted above, the author of this article served on the TBA Committee to review the Uniform Trust Code and suggest revisions for implementation in Tennessee). In this case, the Trustee entered into the Client Agreement with Wunderlich pursuant to its duties and powers to make investments and manage the Trust money. The Trustee did not enter into the Client Agreement as Alexis's representative, or with the express purpose of binding Alexis to the agreement, but rather as the manager of the Trust assets. Therefore, Section 35-15-303 does not operate to bind Alexis to the Client Agreement or to the predispute arbitration provision included therein.

- 28 -

"balance bill" any Blue Cross member, that is, Vanderbilt agreed not to bill Blue Cross members for the difference between the actual medical expenses and the contractually discounted rates. *Id.* When Benton filed suit against the owner of the automobile that struck his vehicle, Vanderbilt filed a statutory lien against Benton's recovery. *Id.*

Vanderbilt's filing of the statutory lien prompted Benton to file a separate lawsuit against Vanderbilt, alleging that the lien filed by Vanderbilt breached the "balance billing" provision in its contract with Blue Cross, in which Vanderbilt agreed to accept the discounted payment from Blue Cross as payment in full for treating the insured. *Id.* The contract between Vanderbilt and Blue Cross Blue Shield included an arbitration provision. Vanderbilt filed a motion to compel arbitration pursuant to the arbitration provision in its contract with Blue Cross Blue Shield, and Benton opposed it. *Id.* The trial court in *Benton* declined to compel arbitration, but the Court of Appeals reversed, holding that Benton was obliged to arbitrate his claims against Vanderbilt. *Id.* at 617.

On appeal in *Benton*, this Court sought to balance, on one hand, the principle that an arbitration agreement is not binding on one who is not a party to it, and, on the other hand, the longstanding principle that a third-party beneficiary to a contract must accept its burdens along with its benefits. *See id.* at 617-18; *see also U.S. Fid. & Guar. Co. v. Elam*, 278 S.W.2d 693, 702 (Tenn. 1955) (quoting 12 Am. Jur. § 289, p. 842) ("'[B]efore the beneficiary may accept the benefits of the contract, he must accept all of its . . . obligations. It has been said that if the beneficiary accepts, he adopts the bad as well as the good, the burden as well as the benefit.'"). The *Benton* Court framed the issue as "whether an arbitration provision in a contract is binding against a third-party beneficiary who brings an action seeking to enforce the terms of that contract." *Benton*, 137 S.W.3d at 618. First, the Court pointed out that a third party is an intended third-party beneficiary of a contract where: "(1) the parties to the contract have not otherwise agreed, (2) recognition of the third-party's right to performance is appropriate to effectuate the parties' intent, and (3) terms or circumstances indicate that performance of the promise is intended or will satisfy an obligation owed by the promise to the third party." *Id.* at 618. It then focused on the "general rule" that "a third-party beneficiary *who seeks to enforce rights under a contract* is bound by an arbitration provision in that contract." *Id.* (emphasis added). The Court elaborated: "[W]here a third-party beneficiary seeks to enforce rights under a contract, an interpretation of the contract as a whole requires that the third party not be permitted to interpret the contract in a piecemeal fashion by avoiding unfavorable terms."[38] *Id.* at 619-20.

---

[38] The principle relied upon in *Benton*, that "a person cannot assert a claim that is based on an agreement while simultaneously seeking to disavow a portion of the agreement," is sometimes referred to as an "estoppel" or "equitable estoppel" theory. *See* Radford, *supra*, at 311. One author explains it as follows:

The Court in *Benton* noted that Benton was a third-party beneficiary to the contract between Vanderbilt and Blue Cross Blue Shield and that his claim sought to enforce that contract. Consequently, it held, Benton was subject to the arbitration provision in the contract. *Id.* at 620. The Court underscored, however, "that an arbitration provision in a contract is applicable only to actions brought by a third-party beneficiary *seeking to enforce rights under that contract*." *Id.* (emphasis added). It added: "An arbitration provision may not be applicable in cases where claims are raised under other legal theories and are not intertwined with rights being enforced under the terms of the contract." *Id.*

It is useful to compare the reasoning in *Benton* with the reasoning used by courts in other jurisdictions that have reached a similar result. The Alabama Supreme Court discussed two different rationales for holding a nonsignatory third-party beneficiary bound by an arbitration agreement in *Cook's Pest Control, Inc. v. Boykin,* 807 So. 2d 524, 526-28 (Ala. 2001). In *Cook's*, the plaintiff suffered hundreds of fire ant bites while a patient at the defendant hospital. She filed suit against the defendant hospital and also against the hospital's pest control company, alleging negligence and wantonness. The defendant pest control company sought to compel the plaintiff to arbitrate under the

---

> Equitable estoppel precludes [a] party from claiming benefits of a contract while simultaneously attempting to avoid burdens that contract imposes. Thus, under the doctrine of equitable estoppel, a signatory to an arbitration agreement cannot, on the one hand, seek to hold a nonsignatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a nonsignatory.

Martin Domke, Gabriel Wilner & Larry E. Edmonson, 1 *Domke on Com. Arb.* § 13:8 Estoppel (August 2016 Update) (footnotes omitted). However, this principle is distinct from the common law principle of equitable estoppel, under which a party who has made a false or misleading representation of fact may be estopped from later asserting inconsistent facts. *See* Michael A. Rosenhouse, *Application of Equitable Estoppel Against Nonsignatory to Compel Arbitration Under Federal Law,* 43 A.L.R. Fed. 2d 275 (2010) ("The case law applying 'equitable estoppel' to compel arbitration by or against a nonsignatory is a distinct body of federal law not ostensibly moored in common-law principles of equitable estoppel, which is primarily concerned with misleading statements of fact."); *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 315-16 (Tenn. 2009) (reciting elements of equitable estoppel, contrasting with judicial estoppel, and holding neither was applicable in that case). For clarity, and to avoid confusion with the common law doctrine of equitable estoppel, we will refer to the principle set forth in *Benton* as a third-party beneficiary theory. *See* Radford, *supra*, at 311 ("[C]ourts have used a variety of overlapping theories to [conclude that a nonsignatory beneficiary is bound by an arbitration agreement and] have not consistently applied the same labels to these theories . . . ."). We also recognize that the term "estoppel" can be used in a variety of contexts. *See generally Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 531 (5th Cir. 2000) (Dennis, J., dissenting) (quoting 4 Richard A. Lord, Williston on Contracts § 8.5 (4th ed.1992)) ("[N]early anything can be called estoppel. When a lawyer or a judge does not know what other name to give for his decision to decide a case in a certain way, he says there is an estoppel.").

arbitration provision in the contract between the hospital and the pest control company. *Id*. at 525.

The court in *Cook's* discussed two different theories under which "a nonsignatory to a contract can be bound by an arbitration agreement contained therein." *Id*. at 526. The first was similar to the reasoning in our *Benton* decision, namely, a third-party beneficiary theory derived from the "general rule" that "'a third-party beneficiary cannot accept the benefit of a contract, while avoiding the burdens or limitations of that contract.'" *Id*. (quoting *Georgia Power Co. v. Partin*, 727 So. 2d 2, 5 (Ala. 1998)). The second was called an "intertwining–claims" theory, under which a nonsignatory to a contract containing an arbitration provision may be compelled to arbitrate if the "nonsignatory's claims are 'intertwined with' and 'related to' the contract." *Id*. at 527. The court found neither theory applicable because the plaintiff's theories of recovery did not depend on the existence of the contract. *Id*. at 526-27. As to the third-party beneficiary theory, it stated: "Because [the plaintiff] has not invoked the benefits of the contract, she cannot be considered a third-party beneficiary; thus, she is not burdened by the contract and cannot be compelled to arbitrate her claims against [the pest control company] under a third-party-beneficiary theory." *Id*. at 527. It held that the intertwining claims theory was not applicable because the plaintiff's complaint "makes substantial allegations of negligence on the part of [the pest control company and the hospital] that are independent of any contractual obligations." *Id*. Consequently, the court in *Cook's* declined to compel the plaintiff to arbitrate her claims.

In a subsequent case, the Alabama Supreme Court held that a trust beneficiary *was* required to arbitrate with brokerage defendants. *Edward D. Jones & Co. v. Ventura*, 907 So. 2d 1035, 1042-43 (Ala. 2005). In that case, the minor beneficiary did not sign the contract with the brokerage defendants; his mother, as conservator, signed the contract. *Id*. at 1038. The beneficiary sought to recover from the brokerage defendants for breach of fiduciary duty, fraud, and suppression. *Id*. at 1042. The court commented that it had "enforced arbitration provisions against nonsignatories under either a third-party-beneficiary theory or an intertwined-claims theory." *Id*. at 1042.

The court in *Edward D. Jones* deemed the beneficiary subject to the arbitration provision. It first explained that, under the complaint filed in that case, the beneficiary had to "rely on or refer to the investment agreements to establish his . . . claims[,]" so "his claims arise out of the investment agreements for purposes of the motions to compel arbitration." *Id*. at 1042. The court then held that the plaintiff was subject to the arbitration clause in the investment agreement because he was "a third-party beneficiary of the accounts and because his claims [arose] out of the manner in which the investment accounts were managed or should have been managed, [so] he is seeking the benefits of

the investment agreements entered into by [the conservator]." *Id.* Consequently, the court compelled the plaintiff to arbitrate his claims.

Additional jurisdictions have found trust beneficiaries bound to arbitration agreements entered into by a trustee, even though the beneficiaries did not sign the agreement, because the beneficiary sought to enforce the contract or benefit from it. *See Multi-Fin. Secs. Corp.*, 171 P.3d at 1274 (non-signatory beneficiaries "estopped" from avoiding arbitration provisions in account agreements "whose benefits they seek to enforce."); *Green v. Regions Bank*, No. 2013 CA 0771, 2014 WL 3555820, at *6 (La. Ct. App. Mar. 19, 2014) ("If a non-signatory seeks to enforce the terms of a written agreement containing an arbitration provision, he must accept all of the terms of the agreement . . . . [H]e cannot seek to enforce specific terms of the agreement while seeking to avoid enforcement of the arbitration provision.").

Using a slightly different lens, other jurisdictions have looked at whether the nonsignatory beneficiary's claims "arose out of" the contract that contained the arbitration provision. *See, e.g., In re Blumenkrantz*, 824 N.Y.S.2d 884, 888 (Surrogate's Ct. 2006) (non-signatory beneficiary's claims arose from the customer agreement between trustee and Wachovia Securities, and beneficiary could not simultaneously assert a claim under the agreement and reject the arbitration provision); *Merrill Lynch, Pierce, Fenner & Smith v. Eddings*, 838 S.W.2d 874, 879 (Tex. App. 1992) (non-signatory settlor and beneficiaries bound by arbitration provision in account agreement because it was underlying basis for their claims; held that "beneficiaries of a trust are bound by a clause in an account agreement to arbitrate the claims arising out of transactions in the trust's account."); *In re Jean F. Gardner Amended Blind Trust*, 70 P.3d 168, 170 (Wash. Ct. App. 2003) (non-signatory beneficiary bound to arbitrate because her claims directly concerned or arose from the account agreement containing the arbitration clause).

Nonsignatory beneficiaries have not been compelled to arbitrate where their claims were independent of the contract that contained the arbitration provision. *See, e.g.*, *Pinnacle Trust Co. v. McTaggart*, 152 So. 3d 1123, 1129-30 (Miss. 2014) (beneficiaries not compelled to arbitrate because their claim against former trustee and trust advisor was based on duty imposed by statute and not on breach of wealth management agreement); *Clark v. Clark*, 57 P.3d 95, 98 (Okla. Civ. App. 2002) (beneficiary's claims of breach of fiduciary duty and negligence against financial advisor arose from duties beyond the duties under the account agreement; court reasoned that under Oklahoma law fiduciary duties can arise outside of a contractual relationship; also because agreement excluded third-party beneficiaries from being bound). Courts have also declined to hold a nonsignatory beneficiary subject to an arbitration provision where the contract was not intended to benefit them. *See e.g., Morgan Stanley DW Inc. v. Halliday*, 873 So. 2d 400, 402-403 (Fla. Dist. Ct. App. 2004) (beneficiary not bound by

arbitration provision in account agreement signed by trustee under third-party beneficiary theory because agreement did not clearly express an intent to primarily and directly benefit the third-party); *Schmitz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 939 N.E.2d 40, 45 (Ill. App. Ct. 2010) (beneficiaries not bound by arbitration clauses under third-party beneficiary theory because client agreements between trustee and financial advisor did not expressly show intent to bind or benefit trust beneficiaries).

In *Benton*, this Court held "that an arbitration provision in a contract is applicable only to actions brought by a third-party beneficiary *seeking to enforce rights under that contract.*" *Benton*, 137 S.W.3d at 620 (emphasis added). As can be seen, other courts have enforced an arbitration provision against a nonsignatory beneficiary on somewhat different reasoning, as where the beneficiary's claims either "arose out of" the contract that contained the arbitration provision or were "intertwined with" that contract. We are not persuaded to go beyond the parameters established in *Benton*.[39] Thus, in accord with *Benton*, we hold that a nonsignatory third-party beneficiary is bound to an arbitration provision in a contract to the extent that the beneficiary's claims seek to enforce the contract. This is consistent with the premise for the *Benton* holding: "'Before the beneficiary may accept the benefits of the contract, he must accept all of its . . . obligations[,] . . . the burden as well as the benefit.'" *Id*. at 618 (quoting *U.S. Fid. & Guar. Co.*, 278 S.W.2d at 702). To the extent that Plaintiff's claims against the Defendants do not seek to enforce the Client Agreement, Plaintiff is entitled to judicial resolution of those claims. *See Clark*, 57 P.3d at 100 (Buettner, J., concurring).

*Minor Beneficiary*

Plaintiff also argues that, because the beneficiary in this case was a minor, the arbitration agreement would not be binding "because in Tennessee agreements with minors are voidable." We agree that, in Tennessee, "'[a] minor's contracts, generally speaking, are voidable.'" *Am. Sur. Co. of N.Y. v. City of Clarksville*, 315 S.W.2d 509, 512 (1958) (quoting *W. Union Tel. Co. v. Ausbrooks*, 257 S.W. 858, 960 (Tenn. 1924)). "The minor can repudiate such contracts or can elect to claim their advantage." *Id.* However, Plaintiff does not occupy the same position as a minor who signed a contract and now seeks to repudiate it. We have held that Plaintiff, though a nonsignatory, may

---

[39] We note that the *Benton* Court uses the word "intertwined" in one sentence: "An arbitration provision may not be applicable in cases where claims are raised under other legal theories and are not intertwined with rights being enforced under the terms of the contract." *Benton*, 137 S.W.3d at 620. This passing reference does not equate to an endorsement of an "intertwined claims theory," and in fact the same sentence also refers to "rights being *enforced* under the terms of the contract. We decline to adopt the intertwined claims theory in this case. In other words, a party should not be compelled to arbitrate claims that are merely "intertwined with" contractual rights that arise from a contract containing a predispute arbitration clause.

- 33 -

be bound by the arbitration provision in the Client Agreement to the extent that Plaintiff's claims seek to enforce the Client Agreement. If Plaintiff seeks to enforce some portions of the Client Agreement, Plaintiff may not at the same time choose to repudiate other portions of the same agreement. Thus, this argument is unavailing.

The fact that Alexis was a minor arises in another context. Courts in Tennessee assume a special responsibility to protect a minor's interests. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 178 (Tenn. 2011). The state's concern for minors in the context of arbitration is evidenced in Tenn. Code Ann. § 29-5-101, which provides: "All causes of action . . . may be submitted to the decision of one (1) or more arbitrators, *except* in one (1) of the following cases: (1) *Where one (1) of the parties to the controversy is an infant* or a person adjudicated incompetent; . . . ." Tenn. Code Ann. § 29-5-101 (2012) (emphasis added).[40] This code section forbidding arbitration where one party is a minor dates back to 1932 and since its enactment has retained the same wording almost verbatim. *See* Shannon's Code of Tenn. 1932, Article I, Arbitration, § 9359. For the reasons outlined below, we have concluded that this statute has no effect on the issues in this appeal.

First, the statute does not affect our decision that the Trustee did not breach his fiduciary duty simply by executing a contract that contained a predispute arbitration provision. As we have explained, in signing the Client Agreement, the Trustee acted for itself and not as an agent of the minor Trust beneficiary. In other words, the Trustee only directly bound itself to arbitrate future disputes with Wunderlich, and did not directly obligate the minor Trust beneficiary under the arbitration provision in the Client Agreement.

Second, section 29-5-101 does not render the arbitration provision in the Client Agreement unenforceable against the minor Trust beneficiary because the state statute is preempted by federal law, specifically, the FAA. See *supra*, footnote 36. Section 2 of the FAA permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (LexisNexis 2008). "This saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but *not by defenses that apply only to arbitration* or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (emphasis added) (quoting *Doctor's Ass'n., Inc. v. Casarotto*, 517 U.S.

---

[40] After oral argument in this case, the Court invited the parties to brief any effect this statute might have on the issues presented in this appeal. The Court appreciates the excellent supplemental briefs provided by both parties.

681, 687 (1996)). "Although § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives," which are "to ensure the enforcement of arbitration agreements according to their terms." *Id.* at 343-44; *see also Casarotto*, 517 U.S. at 687 ("Courts may not . . . invalidate arbitration agreements under state laws applicable *only* to arbitration provisions."); *Volt*, 489 U.S. at 477 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (state law is preempted "to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'"). Thus, conflicting state-law rules that apply only to arbitration, such as section 29-5-101, are preempted by the FAA. *Concepcion*, 563 U.S. at 341. For that reason, we hold that section 29-5-101 is not a reason to decline to compel arbitration in this case.

*Remand*

On remand, the trial court must determine which of the Plaintiff's claims are subject to the arbitration agreement; in other words, which claims seek to enforce the Client Agreement that contains the predispute arbitration provision. This may be easier said than done. In some circumstances, for example, claims that seek to enforce the Client Agreement may be intertwined with claims that do not.

The FAA "requires courts to enforce the bargain of the parties to arbitrate," and not substitute the court's "'views of economy and efficiency' for those of Congress." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985) (quoting *Dickinson v. Heinold Secs., Inc.*, 661 F.2d 638, 646 (7th Cir. 1981)). It "divests . . . courts of any discretion regarding arbitration in cases containing both arbitable and nonarbitrable claims, and instead requires that the courts compel arbitration of arbitrable claims, when asked to do so." *Id.*

However, the converse is also true. The court may not simply refer all of the claims to arbitration, "even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Id.* at 217. A decision to require the Plaintiff to arbitrate a claim that does not seek to enforce the Client Agreement, merely because it is "intertwined" with a claim that *does* seek to enforce the Client Agreement, "would 'threaten to overwhelm the fundamental premise that a party cannot be compelled to arbitrate a matter without its agreement.'" *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 361 (5th Cir. 2003) (quoting J. Douglas Uloth & J. Hamilton Rial, III, *Equitable Estoppel as a Basis for Compelling Nonsignatories to Arbitrate—A Bridge Too Far?*, 21 Rev. Litig. 593, 633 (2002)) (a finding that plaintiff's claims against signatory were "inextricably intertwined" with its claims against non-signatory is insufficient to justify application of estoppel to non-signatory's opposition to

arbitration).  The sometimes difficult task of sorting this out is essential to ensuring that Plaintiff assumes the burden of the Client Agreement only insofar as Plaintiff seeks the benefit of it.[41]  *Benton*, 137 S.W.3d at 618.

In this opinion, we have discussed legal theories regarding third-party beneficiaries and how one who did not sign a contract *may* still be bound to a predispute arbitration agreement therein.  However, we make no holding regarding whether Plaintiff in this case is in fact bound to the predispute arbitration clause in the Client Agreement based on the claims asserted in the amended complaint.  That issue is beyond the purview of the questions certified in this appeal, so we leave it in the capable hands of the trial judge.

## CONCLUSION

In this interlocutory appeal, we are asked to determine whether the signature of the trustee on an investment/brokerage account agreement that includes a predispute arbitration provision binds the minor beneficiary of the trust to the arbitration provision. We hold that the Tennessee Uniform Trust Code gives trustees broad authority to enter into contracts in the course of fulfilling their duties as trustee.  We also hold that the Tennessee Uniform Trust Code gives trustees the power to enter into predispute arbitration agreements, so long as doing so is not prohibited under the operative trust instrument.  We hold that the Trust Instrument in this case gives the Trustee broad authority and does not prohibit the Trustee from entering into a predispute arbitration agreement.  Consequently, we interpret the Trust Instrument as authorizing the Trustee to

---

[41] On remand, the trial court will be applying common-law principles to determine the extent to which the nonsignatory third-party beneficiary may be bound to the arbitration provision in the Client Agreement.  This is separate and distinct from interpreting the Client Agreement to determine which claims are "arbitrable." Similar to many such agreements, the predispute arbitration provision in the Client Agreement states that "any controversy concerning whether an issue is arbitrable, *shall be determined by arbitration*." (emphasis added).  "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability) courts generally . . . should apply ordinary state-law principles that govern the formation of contracts," keeping in mind the important qualification that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citing *AT&T Techs.*, 475 U.S. at 649).

Because we do not interpret the Client Agreement in this opinion, we need not consider the choice-of-law provisions in the Client Agreement, pointed out by Defendants on supplemental briefing. *See Concepcion*, 563 U.S. at 344 ("[P]arties may agree to limit the issues subject to arbitration, to arbitrate according to specific rules, and to limit with whom a party will arbitrate its disputes."); *Volt*, 489 U.S. at 478-79 (noting that court must honor choice-of-law provision in arbitration agreement).

execute the Client Agreement, including the predispute arbitration provision therein. Thus, under the Tennessee Uniform Trust Code and the Trust Instrument, the Trustee had authority to enter into the arbitration agreement contained within the Client Agreement. Under *Benton v. Vanderbilt University*, 137 S.W.3d 614, 616 (Tenn. 2004), a third-party beneficiary who did not sign a contract containing an arbitration provision may be required to arbitrate claims against a signatory to the contract under the principle that a third party who seeks the benefit of a contract must also bear its burdens. Applying this principle, the Trust beneficiary in this case may be bound to arbitrate claims against Wunderlich that seek to enforce the Client Agreement. We reverse the decision of the Court of Appeals and vacate the trial court order compelling arbitration of all claims. We remand the case to the trial court for further proceedings, including a determination as to whether Plaintiff is a third-party beneficiary of the Client Agreement and which, if any, of the claims asserted by Plaintiff seek to enforce the Client Agreement.

Accordingly, we reverse the judgment of the Court of Appeals, vacate the order of the trial court compelling arbitration, and remand to the trial court for further proceedings consistent with this Opinion. Costs of this appeal are taxed equally to Appellants Albert Alexander, Jr., and Wunderlich Securities, Inc., and their surety, and Appellee Wade Harvey, Jr., ex rel. Alexis Breanna Gladden, for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE