COURT OF CHANCERY
OF THE
STATE OF DELAWARE

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Final Report:  December 13, 2019
Draft Report:
Date Submitted:   November 14, 2019

Stephen A. Spence, Esquire
Baird Mandalas Brockstedt, LLC
1413 Savannah Road, Suite 1
Lewes, DE 19958

Stephen P. Ellis, Esquire
Stephen P. Ellis Law Firm, LLC
9 North Front Street
PO Box 574
Georgetown, DE 19947

RE:   *Michael D. Chase v. Martha L. Chase and Clare L. Chase*
       C.A. No. 2019-0402-PWG

Dear Counsel:

Pending before me is a motion to dismiss the count in a counterclaim that seeks a declaratory judgment requiring the immediate distribution of trust property to the trust's residuary beneficiaries.  Counterclaim-defendants argue that the property cannot be distributed until trust obligations are paid and administration of the trust is completed, and that the Court should not involve itself in claims regarding the Tennessee trust.  Counterclaim-plaintiffs respond that this Court can

resolve these claims and the trust requires immediate distribution of trust property to the beneficiaries. I recommend the Court find that Delaware courts can hear the trust claims but grant the motion to dismiss because it is not reasonably conceivable that the trust could be interpreted to require immediate distribution of the trust's property under the circumstances. This is a final report.

## I.    Background

On August 8, 2001, spouses Louise Chase ("Louise") and Nicholas Chase ("Nicholas") deeded to themselves undivided 50% interests as tenants in common of property located on Columbia Avenue, Rehoboth Beach, Delaware ("Property").[1] On January 22, 2004, Nicholas established the Irrevocable Trust of Nicholas J. Chase ("Trust") in Tennessee, naming his sons, Michael Chase ("Michael") and Stephen Chase ("Stephen"), as co-trustees of the Trust (together, "Co-Trustees").[2] That same day, Nicholas transferred his interest in the Property to the Trust.[3] The Trust provided that, during Nicholas' lifetime, Co-Trustees shall

---

[1] Docket Item ("D.I.") 1, Ex. A. The Property is merged but assessed for Rehoboth Beach tax purposes as 40 Columbia Avenue (Lot V) and 42 Columbia Avenue (Lot U). D.I. 6, ¶ 10. The legal description in the August 8, 2001 and January 22, 2004 deeds, and the Mortgage, described the Property as "Lots V, U and the northeast half of Lot T, Seaview Park." D.I. 1, Ex. A, Ex. B; D.I. 12, Ex. C. I use first names in pursuit of clarity and intend no familiarity or disrespect.

[2] D.I. 5, Ex. 1, Art. 10. Nicholas and Louise moved to Knoxville, Tennessee in 1994. D.I. 6, ¶ 15.

[3] D.I. 1, Ex. B. And, the Property was included in the schedule of Trust property attached as an exhibit to the Trust. D.I. 5, Ex. 1.

pay income or principal from the Trust for Nicholas' "care, support, health, and comfort" and, upon his death, "the rest residue and remainder of the trust estate shall be distributed to [Nicholas'] then living issue, per stirpes," if Louise predeceased him.[4]

Louise's 50% interest in the Property devised to Louise and Nicholas' five children, Michael, Stephen, Mary Ann Chase Gaston ("Mary Ann"), Martha Chase ("Martha") and Clare Chase ("Clare") upon Louise's death on December 31, 2008, with each owning a 10% interest in the Property.[5] On July 22, 2015, Co-Trustees executed a mortgage ("Mortgage") on the Trust's share of the Property securing a revolving line of credit of up to $500,000.00.[6] The line of credit currently has a principal balance of $298,509.65.[7] Co-Trustees contend the line of credit was needed because Nicholas' liquid assets were insufficient to pay for the level of skilled care he required until his death at 103 years of age on November 4, 2016.[8] Martha and Clare (together, "Respondents") argue that Nicholas' liquid assets were sufficient to pay for his health, support and maintenance needs until he was 107

---

[4] D.I. 5, Ex. 1, Art. 3, 4(b).

[5] D.I. 1, ¶¶ 2, 4.

[6] D.I. 12, Ex. C. The mortgage was recorded on September 17, 2015. D.I. 12, Ex. C.

[7] D.I. 1, ¶ 6.

[8] D.I. 6, ¶ 18; D.I. 12, at 2.

years of age, and that Co-Trustees' mismanagement of Nicholas' assets caused the "purported need to seek a line of credit."[9]

On May 29, 2019, Michael and Stephen, individually and as co-trustees, and Mary Ann, petitioned the Court to partition the Property and order a partition sale of the Property, asserting a partition in kind would be detrimental to the interests of the co-owners.[10]  Respondents' August 7, 2019 answer denied that a partition in kind would be detrimental to the co-owners' interests since the Property is equivalent to two and one-half typical Rehoboth Beach lots and can be equitably divided among the co-owners, resulting in an increase of value to each co-owner.[11] In their August 7, 2019 counterclaim ("Counterclaim"), Respondents seek damages from Co-Trustees for unlawful ouster by not allowing them to access or use the Property, and for waste of the Property caused by the Co-Trustees' failure to properly care for the Property or to rent the Property to produce revenue.[12] Respondents also seek a declaratory judgment that Co-Trustees have failed to comply with the terms of the Trust and are required to immediately distribute the Property to Nicholas' five children.[13]

---

[9] D.I. 5, at 9.

[10] D.I. 1.

[11] D.I. 5, at 5-6.

[12] D.I. 5, at 12-13.

[13] D.I. 5, at 14.

In their response to the Counterclaim, Co-Trustees deny that they have ousted Respondents, and argue that Respondents have had full access to the Property and have been the primary occupiers of the Property, so any rent due would be owed by Respondents.[14] They also claim Respondents have failed to notify Co-Trustees of needed repairs or to maintain the Property that they are using, and have refused to consider third-party rental of the Property because it would interfere with their use.[15] Co-Trustees allege their inability to distribute Trust assets has resulted from Respondents' actions, and Trust assets will be distributed once all Trustee expenses, including the Mortgage, are paid.[16]

On September 11, 2019, Co-Trustees filed a motion to dismiss Count III of the Counterclaim ("Motion") because, they argue, there are no disputed material facts; Count III seeks a distribution of Trust assets prior to paying Trust expenses, contrary to the Trust and the law; and the Court of Chancery should not review claims of Trust mismanagement, since Tennessee law controls the interpretation and enforcement of the Trust.[17] They also seek attorneys' fees. Respondents oppose the Motion, asserting that there are disputed material facts about the "Co-Trustees' management of the Trust and the meaning and application of the Trust's

---

[14] D.I. 6, ¶¶ 31-35.

[15] *Id.*, ¶¶ 25, 27.

[16] *Id.*, ¶¶ 41, 43.

terms," and the Court of Chancery is capable of reviewing and interpreting Tennessee law.[18]

## II. Analysis

Under Court of Chancery Rule 12(b)(6), the Court may dismiss a party's claims for failure to state a claim. The facts for purposes of the motion to dismiss under Rule 12(b)(6) are drawn from the counterclaim and all well-pled allegations in the counterclaim are assumed to be true, with the counterclaim-plaintiffs receiving the benefit of all reasonable inferences.[19] Vague allegations are considered "well-pleaded" if they provide the opposing party with notice of the claim.[20] But, conclusions in the counterclaim are not accepted as true without allegations of facts to support them.[21] A broad brush is used in determining sufficiency of claims – whether the counterclaim-plaintiffs may recover under any reasonably conceivable set of circumstances susceptible of proof.[22] If recovery on a particular claim is not reasonably conceivable, then the Court grants the motion

---

[17] D.I. 7; D.I. 12, at 5-7.

[18] D.I. 10, ¶¶ 6, 7.

[19] *Cf. Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 326 (Del. 1993); *Prairie Capital III, LP v. Double E Holding Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[20] *Savor, Inc. v. FMR Corp.*, 812 A.2d at 896-97.

[21] *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d at 326.

[22] *Cf. Cent. Mortg. Co.*, 27 A.3d at 536.

and dismisses that claim under Rule 12(b)(6); if it is, the motion to dismiss is denied.

Here, the Motion seeks dismissal of Count III of the Counterclaim, which asks the Court to declare that the Trust requires the immediate distribution of the Trust's share of the Property to Nicholas' five children. The main issues are (1) whether the Court of Chancery should apply Tennessee law regarding Co-Trustees' management of the Trust, and (2) whether it is reasonably conceivable that the Trust could be interpreted to require immediate distribution of the Trust's property.[23]

---

[23] Co-Trustees also cite to the Trust's in terrorem clause to support the Motion. D.I. 7, ¶ 9. Article 19 of the Trust provides that the interest of any beneficiary who contests the validity of the Trust is revoked. D.I. 5, Ex. 1, Art. 19. Respondents claim the in terrorem clause has no relevance since Respondents are not contesting the Trust's validity but asking that the Court interpret the Trust's terms. D.I. 10, ¶ 7. Under Tennessee law, forfeiture, or in terrorem, clauses have been upheld as consistent with public policy but will not be enforced where the litigation is pursued in good faith and upon probable cause. *Cf. Winningham v. Winningham,* 966 S.W.2d 48, 51 (Tenn. 1998); *In re Estate of Cook*, 2004 WL 3021131, at *11 (Tenn. Ct. App. Dec. 30, 2004) (citing *Tate v. Camp*, 245 S.W. 839, 843-44 (Tenn. 1922)). Here, the in terrorem clause specifically prohibits beneficiaries from contesting the "validity" of the trust and does not impose broader restrictions. In the dictionary, "validity" is defined as "the state of being acceptable according to the law." *Validity*, Merriam-Webster Dictionary, https:///www.merriam-webster.com/dictionary/validity (last visited December 12, 2019). The evidence does not show, at this juncture, that Respondents are questioning that the Trust is legally valid, or that the in terrorem clause applies to support the dismissal of Count III.

Considering the first issue, Co-Trustees ask the Court to decline to review the Trust claims because they should be addressed by Tennessee Courts.[24] It is not uncommon for Delaware courts to apply other states' law related to matters of controversy before them, just as other states "have been called upon to apply Delaware law."[25] And, although it is not clear if the Motion is asking the Court to dismiss the Trust claims because they should be litigated in another forum on the grounds of *forum non conveniens*, I consider the Motion on those grounds.[26]

"The standards that govern a motion to dismiss on grounds of *forum non conveniens* are well-established under Delaware Law."[27] A plaintiff's choice of Delaware as its forum is presumed to be proper and the defendant "bears a heavy burden" to obtain dismissal on the grounds of *forum non conveniens*.[28] It is well-

---

[24] D.I. 12, at 6.

[25] *Cf. Williams Nat. Gas Co. v. Amoco Prod. Co.*, 1990 WL 13492, at *8 (Del. Ch. Feb. 15, 1990) ("Delaware courts are often called upon to apply the law of sister states").

[26] Unlike the typical jurisprudence governing *forum non conveniens*, the Motion addresses only one count of a counterclaim and not the action as a whole. Since the other counts pertain to claims involving the partition of the Property, which is located in Delaware, they are appropriately litigated in Delaware courts and I consider that in my analysis.

[27] *Mar-Land Indus. Contractors, Inc. v. Caribbean Petroleum Ref., L.P.*, 777 A.2d 774, 777-78 (Del. 2001); *see also Martinez v. E.I. DuPont de Nemours & Co.*, 86 A.3d 1102, 1104–05 (Del. 2014), *as revised* (Mar. 4, 2014).

[28] *Mar-Land Indus. Contractors, Inc.*, 777 A.2d at 778; *see McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.,* 263 A.2d 281, 283 (Del. 1970) ("as a general rule, litigation should be confined to the forum in which it is first commenced, and a defendant should not be permitted to defeat the plaintiff's choice of forum in a pending suit by commencing litigation involving the same cause of action in another

settled that "defendants moving to dismiss a *first-filed* suit on the grounds of *forum non conveniens* must establish with particularity that they will be subjected to overwhelming hardship and inconvenience if required to litigate in Delaware."[29] In cases where the plaintiff has chosen Delaware as its first forum, the Court considers the factors set forth by the Delaware Supreme Court in *General Foods Corp. v. Cryo-Maid, Inc.* and subsequent decisions: "(1) the relative ease of access to proof; (2) the availability of compulsory process for witnesses; (3) the possibility of the view of the premises; (4) whether the controversy is dependent upon the application of Delaware law which Delaware courts more properly should decide than those of another jurisdiction; (5) the pendency or nonpendency of a similar action or actions in another jurisdiction; and (6) all other practical problems that would make the trial of the case easy, expeditious and inexpensive."[30]

In this case, there is no evidence of a previously filed action in another jurisdiction, so the *forum non conveniens* analysis is guided by the *Cryo-Maid*

---

jurisdiction of its own choosing"). Although the claims being sought to be dismissed were brought in a counterclaim so that the counterclaim-plaintiffs did not choose the forum initially, they could have pursued the Trust claims in a separate action in Tennessee.

[29] *Lisa, S.A. v. Mayorga*, 993 A.2d 1042, 1047 (Del. 2010) (citing *Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 1199 (Del. 1997)); *Gramercy Emerging Markets Fund v. Allied Irish Banks, PLC*, 173 A.3d 1033, 1044 (Del. 2017).

[30] *Martinez*, 86 A.3d at 1104; *Gramercy Emerging Markets Fund*, 173 A.3d at 1036-37; *Gen. Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681, 684 (1964), *overruled in part by Pepsico, Inc. v. Pepsi-Cola Bottling Co. of Asbury Park*, 261 A.2d 520 (Del. 1969).

factors. Co-Trustees focus on the fourth factor in their argument – the Trust is construed and enforced under Tennessee laws and Delaware law is not applicable, and Respondents have not sought a review of the Trust administration in Tennessee in the three years since Nicholas' death.[31] Even though it may be more convenient for Tennessee courts to apply Tennessee law to the Trust claims, I consider that the partition is the first-filed action; Delaware courts are capable of applying Tennessee law; and there is no evidence that litigating Count III in Delaware would affect the ease of access to evidence or cause practical problems making litigation of the claims more difficult, expensive, or slower. I find that, considering dismissal on the grounds of *forum non conveniens*, Co-Trustees have not established, with particularity, that they will suffer overwhelming hardship and inconvenience if the Trust claims are litigated in Delaware. Accordingly, I recommend against dismissal of Count III on that basis.

Next, I consider whether it is reasonably conceivable that the Trust could be interpreted to require immediate distribution of the Trust's property. If it is not reasonably conceivable, then Count III of the counterclaim should be dismissed. Respondents claim that there are factual disputes about the "meaning and application about the Trust's terms," and about Co-Trustees' failure to comply with the terms of the Trust by mismanaging Trust assets and by not distributing

---

[31] D.I. 12, at 6, 7.

10

Trust assets to the beneficiaries upon Nicholas' death.[32] Co-Trustees deny there are disputed material facts and seek dismissal because Count III is premature – it would be contrary to the terms of the Trust and law for Trust assets to be distributed prior to paying Trust expenses, including the Mortgage.[33]

In this case, I consider whether the Trust requires the immediate distribution of Trust assets upon Nicholas' death. First, the Trust provides that it "shall be construed and enforced in accordance with the laws of the State of Tennessee."[34] Accordingly, I apply Tennessee law in interpreting the Trust.[35] Under Tennessee law, "[t]he interpretation of a trust instrument is a question of law for the court."[36] Trust instruments are construed "in much the same way [courts] interpret contracts or wills," and the "important thing in the construction of the trust instrument is to determine the intention of the settlor as evidenced by all the provisions of the instrument."[37]

---

[32] D.I. 10, ¶ 6.

[33] D.I. 7; D.I. 12, at 5-7.

[34] D.I. 5, Ex. 1, Art. 18.

[35] *Harvey ex rel. Gladden v. Cumberland Tr. & Inv. Co.*, 532 S.W.3d 243, 260, n. 29 (Tenn. 2017) ("Tennessee statutes provide that the 'construction and administration of a trust are determined by the law of the jurisdiction designated in the terms of the trust instrument'") (citing Tenn. Code Ann. § 35-15-107(a) (2015)).

[36] *Reed v. Reed*, 2018 WL 842422, at *2 (Tenn. Ct. App. Feb. 13, 2018) (citation omitted).

[37] *Harvey ex rel. Gladden*, 532 S.W.3d at 261 (citation omitted).

Article 4(b) of the Trust provides that, following Nicholas' death, if his wife does not survive him, "the rest residue and remainder of the trust estate shall be distributed to [Nicholas'] then living issue, per stirpes."[38] However, the question is how that Article interrelates with other trustee powers and duties, and are the Co-Trustees obligated to address outstanding Trust obligations before the distribution occurs?

Article 11 of the Trust grants Co-Trustees "the powers applicable to trustees set forth in Tennessee Code Annotated Section 35-50-110, which powers are incorporated herein by reference, except such of those powers inconsistent with the express provisions of this trust agreement."[39] Section 35-50-110, detailing a fiduciary's powers, provides that a fiduciary is authorized, "in behalf of the estate, to borrow money," and to secure those loans by "mortgages . . . imposing liens upon real property," and to "repay those loans, including principal and interest due thereon."[40] The fiduciary has the power to settle "claims or demands against the estate, or held in behalf of the estate."[41] Section 35-15-816 of the Tennessee Code details trustees' specific powers, which that statute provides are also included by

---

[38] D.I. 5, Ex. 1, Art. 4(b).

[39] *Id.*, Art. 11(a).

[40] Tenn. Code Ann. § 35-50-110(8) (2015). A fiduciary includes a trustee under any trust. Tenn. Code Ann. § 35-2-102(a)(2) (1988).

[41] Tenn. Code Ann. § 35-50-110(11).

reference when a trust incorporates by reference the powers in section 35-50-110.[42]

Section 35-15-816 authorizes a trustee to "[b]orrow money, with or without security, and mortgage or pledge trust property for a period within or extending beyond the duration of the trust."[43]

Respondents argue that Co-Trustees did not need to mortgage the Property because there were sufficient Trust assets to satisfy Nicholas' needs. Any dispute regarding Co-Trustees' management of Trust funds is not central to determining whether immediate distribution of Trust property is required under the Trust.[44] Under the Trust and Tennessee law, Co-Trustees had the authority to borrow money on behalf of the Trust and mortgage the Trust's interest in the Property to secure the loan. It was Nicholas' intent, as grantor, that Co-Trustees use Trust assets, including income and principal, for his health and support during his lifetime and, following his death (if Louise predeceased him), to distribute the "rest residue and remainder of the trust estate" to Nicholas' surviving issue, *per stirpes*.[45] He also tasked Co-Trustees with acting as fiduciaries, "after forming a judgment based upon all the circumstances of any particular situation as to the

---

[42] Tenn. Code Ann. § 35-15-816(a) (2015).

[43] Tenn. Code Ann. § 35-15-816(b)(5) (2015).

[44] Count III does not claim a breach of fiduciary duty arising from mismanagement of the Trust before me.

[45] D.I. 5, Ex. 1, Art. 4(b).

13

wisest and best course to pursue in the interest of the [T]rust and the beneficiaries."[46]

There is no dispute as to the facts material to Count III: beginning in July of 2015 (before Nicholas' death) through today, there is a valid lien in the form of a recorded mortgage on the Trust's share of the Property.[47] The Trust's share of the Property is a part of the trust estate, but it is subject to the mortgage lien, which constitutes a debt against the Trust. It is not the Trust's share of the Property that is required by the Trust to be distributed upon Nicholas' death, but the residue of the Trust estate – what is remaining once Trust administration is completed. There is no specific provision in the Trust related to its termination. The distribution of all of the Trust assets under Article 4(b) would serve to, effectively, terminate the

---

[46] D.I. 5, Ex. 1, Art. 12(a) ("the Trustees shall exercise [their] powers at all times in a fiduciary capacity primarily in the interests of the beneficiaries). *See* Tenn. Code Ann. § 35-15-804 (2004) ("A trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distributional requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill and caution."); *Wood v. Lowery*, 238 S.W.3d 747, 765 (Tenn. Ct. App. 2007) ("There is nothing in the record to indicate that [the trustee] acted either unreasonably or with reckless indifference in carrying out its duties as trustee.").

[47] Since the Property is located in Delaware, I look to Delaware law to determine the effect of the mortgage on the Property. Under Delaware law, a mortgage is "a conveyance of an estate by way of pledge for the security of debt." *Handler Const., Inc. v. CoreStates Bank, N.A.*, 633 A.2d 356, 363 (Del. 1993) (citation omitted). A mortgage "shall be a lien from the time of recording." *Id*. (citing 25 *Del. C.* § 2106).

Trust and Co-Trustees have authority to wind up the Trust administration.[48] "In the absence of specific provisions for termination, a trust will continue as long as may be necessary to accomplish the purpose for which it was created."[49] Completion of the Trust's administration, including payment of obligations incurred by the Trust, is necessary to accomplish the Trust's purpose. There is no evidence that Co-Trustees' actions have caused unreasonable delay in the completion of the Trust administration and distribution of the Trust estate. By filing this action, they seek to partition the Property in furtherance of that process. I find it is not reasonably conceivable that the Trust could be interpreted to require immediate distribution of the Trust's assets without first addressing Trust obligations. Count III of the counterclaim is premature. I recommend that the Court grant the motion to dismiss Count III of the counterclaim.

Finally, Co-Trustees request attorneys' fees in their motion to dismiss. Under Delaware law, the standard for awarding attorney's fees in litigation by the Court of Chancery is well-established.[50] Typically, litigants pay their own

---

[48] Section 35-15-816 provides that the trustee may, "[o]n termination of the trust, exercise the powers appropriate to wind up the administration of the trust and distribute the trust property to the persons entitled to it." Tenn. Code Ann. § 35-15-816(b)(26) (2013).

[49] *Third Nat. Bank in Nashville v. Brown*, 691 S.W.2d 557, 561 (Tenn. Ct. App. 1985) (holding that the trustee had to fully execute the trust and pay the residue to the beneficiaries, but "they had no right to immediate payment of the amount on hand until the trustee had exercised its discretion as to payment of [trust] obligations").

[50] Delaware law applies because the request relates to a procedural matter.

attorneys' fees and expenses under the American Rule.[51]  But, courts have deviated from the American Rule under the bad faith exception, which has been found where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims.[52]  Here, there is no evidence of bad faith and I decline to award attorneys' fees to Co-Trustees.

## III.   Conclusion

For the reasons set forth above, I find that this Court may decide claims regarding the Trust, even though the Trust is construed and enforced under Tennessee laws, but recommend the Court grant Co-Trustees' motion to dismiss Count III of the Counterclaim because I find it is not reasonably conceivable that the Trust could be interpreted to require immediate distribution of the Trust's assets.  I also recommend the Court deny Co-Trustees' request for attorneys' fees

---

[51] *Cf. Gatz Properties, LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1222 (Del. 2012); *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005); *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997), *aff'd,* 720 A.2d 542 (Del. 1998).

[52] *Cf. RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (citation omitted); *Montgomery Cellular Holding Co.*, 880 A.2d at 227 (citation omitted); *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)).

related to the motion.  This is a final report and exceptions may be taken pursuant

to Court of Chancery Rule 144.

Respectfully,

/s/ Patricia W. Griffin

Patricia W. Griffin
Master in Chancery